## MACINTOSH v. UNITED STATES.
### No. 341.

Circuit Court of Appeals, Second Circuit.
June 30, 1930.

846

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (John W. Davis, Charles E. Clarke, and Allen Wardwell, all of New York City, of counsel), for appellant.

John Buckley, U. S. Atty., and George H. Cohen, Asst. U. S. Atty., both of Hartford, Conn.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

The appellant was born in Canada, entered the United States in 1904, and was ordained a Baptist minister in 1907, after studying in this country. He went to Canada for two years, and in 1909 returned to the United States and became a professor at Yale University, where he is still teaching.

After filing a declaration of his intention to become a citizen on February 18, 1925, he filed, with the District Court, a petition for naturalization, accompanied by the proper certificate and affidavits of witnesses. June 10, 1929, he was given a preliminary hearing before a naturalization examiner, at which time he submitted a memorandum explaining at length answers to questions which appeared in the preliminary form for the petition for naturalization. Question 22 was, "If necessary, are you willing to take up arms in defense of this country?" to which he answered, "Yes, but I should want to be free to judge as to the necessity." In his memorandum, the petitioner referred to questions 19, 20, and 22, and said:

"19. I believe in the general form of the government of the United States, but I do not regard it as in all respects ideal. I am inclined to think that an adaptation of what is known in municipal government as the 'City Manager Plan' might be better than the present system.

"20 and 22. I am willing to do what I judge to be in the best interests of my country, but only insofar as I can believe that this is not going to be against the best interests of humanity in the long run. I do not undertake to support 'my country, right or wrong' in any dispute which may arise, and I am not willing to promise beforehand, and without knowing the cause for which my country may go to war, either that I will or that I will not 'take up arms in defense of this country', however 'necessary' the war may seem to be to the government of the day.

"It is only in a sense consistent with these statements that I am willing to promise to 'support and defend' the government of the United States 'against all enemies, foreign and domestic'. But, just because I am not certain that the language of questions 20 and 22 will bear the construction I should have to put upon it in order to be able to answer them in the affirmative, I have to say that I do not know that I can say 'Yes' in answer to these two questions."

On June 24, 1929, he submitted, in addition to this memorandum, a memorandum of his war record during the World War and an excerpt from "Who's Who in America." The war record showed service in the Canadian Army as a chaplain overseas in the neighborhood of Vimy Ridge and in the battle of the Somme. He returned to America in 1916 and made addresses supporting the allies, joined the Y. M. C. A. and again went to France in 1918, and took charge of a Y. M. C. A. hut at the front in the St. Mihiel region, until the Armistice.

The statement of facts is stipulated. It appears that the appellant stated that he was ready to give to the United States, in return for citizenship, all the allegiance he ever had given or ever could give to any country, but that he could not put allegiance to the government of any country before allegiance to the will of God. And the applicant explained that, if he were to be a citizen of the United States, he would recognize special duties and obligations by virtue of that citizenship over and above his general duty to humanity as such. The appellant declared that he believed that there was a rightful place for the use of force by the army and navy in the exercise of police functions in national or international relations and that there were circumstances under which such force could also be justifiably used, for instance, to repel invasion, or even to defend a weaker nation. And he stated that, since it would be neither wise nor right for the nation to adopt absolute and unconditional pacifism, the applicant did not believe any moral necessity rested upon him to adopt an unconditionally pacifist position. It was further stipulated that the applicant believed it would be positively immoral to give a blanket promise beforehand to support any and every future war in which one's country might engage,

when in the nature of the case it could not be known so far ahead of the time that all such wars would be morally justified. The applicant also stated that he believed his position would help make for the peace of the world. The court denied his application for citizenship, reciting in the decree that the petitioner is not attached to the principles of the Constitution of the United States.

The Naturalization Act of June 29, 1906, requires the applicant for citizenship before admission, to declare under oath that he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same. U. S. Code, title 8, § 381 (8 USCA § 381). And section 382 provides that, before admission, it shall be made to appear to the satisfaction of the court that, during his five years' residence, preceding the application, the applicant has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. Question 22, which defendant answered in the qualified way referred to, was considered by the Supreme Court in United States v. Schwimmer, 279 U. S. 644, 49 S. Ct. 448, 73 L. Ed. 889, and the court there, in denying the applicant's admission to citizenship, stated that it is the duty of citizens, by force of arms, to defend our government against all enemies whenever necessity arises and this was a fundamental principle of the Constitution. The court said:

"Whatever tends to lessen the willingness of citizens to discharge their duty to bear arms in the country's defense detracts from the strength and safety of the government. And their opinions and beliefs as well as their behavior indicating a disposition to hinder in the performance of that duty are subjects of inquiry under the statutory provisions governing naturalization and are of vital importance, for if all or a large number of citizens oppose such defense the 'good order and happiness' of the United States cannot long endure. * * *" At page 650 of 279 U. S., 49 S. Ct. 448, 450.

And again: "A pacifist, in the general sense of the word, is one who seeks to maintain peace and to abolish war. Such purposes are in harmony with the Constitution and policy of our government. But the word is also used and understood to mean one who refuses or is unwilling for any purpose to bear arms because of conscientious considerations and who is disposed to encourage oth-ers in such refusal. And one who is without any sense of nationalism is not well bound or held by the ties of affection to any nation or government. Such persons are liable to be incapable of the attachment for and devotion to the principles of our Constitution that are required of aliens seeking naturalization. * * *" Page 652 of 279 U. S., 49 S. Ct. 448, 450.

The refusal to perform military service on account of religious scruples has not been regarded as inconsistent with the duties and obligations of citizenship. But the examiner did not exceed his powers in probing into the opinions and beliefs of the appellant. The naturalization law of 1906 (U. S. Code, title 8, §§ 381, 382 [8 USCA §§ 381, 382]) requires that the beliefs of an applicant in respect to his opposition to organized government should be investigated, and it is only when it appears to the satisfaction of the court that the applicant has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same, that he will be admitted. And he must support and defend the Constitution and Laws of the United States against all enemies, foreign and domestic, bearing true faith and allegiance to the same. An inquiry as to whether he will willingly bear arms is a proper inquiry to ascertain where the applicant stands in the test thus laid down by the naturalization law, but it does not follow because the applicant did not answer question No. 22 categorically, but qualified his answer by the statements referred to, that he has not complied with the requirements of the naturalization law entitling him to admission. Question 22 is merely informative and necessarily directed to determine whether the applicant is attached to the principles of the Constitution and laws of the United States. It will, of course, be recognized as a duty of the citizen to bear arms in defense of his country, but there is also the well-recognized qualification that a person does not lack nationalism or affection for his government if, by reason of a conscientious religious scruple, he requests being excused from bearing arms.

The historical evidence of the recognition of the right of a citizen to be excused from military service based on conscientious religious scruples is found in the provisions of some of the state statutes[1] and Constitu-

[1] Georgia: Act Aug. 5, 1782, Colonial Records, Ed. Candler, v. 19, pt. 2, p. 155. Maryland: Laws March, 1778, c. 5, §§ 6 and 15; Act

tions, as well as various acts of Congress.[2] [5] Nor is there any fixed principle of the Constitution of this country requiring a citizen, with conscientious or religious scruples against bearing arms, to nevertheless bear arms in time of war. Congress has recognized that persons having conscientious scruples against bearing arms shall be exempt. Annals of Congress, Thirteenth Congress, Third Session, vol. 3, pp. 774, 775. The Act of January 31, 1903 (chapter 196, § 2, 32 Stat. 775), states that no person whose religious convictions are against war or participation therein shall be compelled to serve in the militia or other armed force. The Act of June 2, 1916 (chapter 134, §§ 58, 59, 39 Stat. 197 [32 USCA §§ 4, 3]), providing that the militia shall consist of able-bodied citizens between the ages of 18 and 45, reads that "all persons who because of religious belief shall claim exemption from military service * * * shall be exempted from militia service in a combatant capacity." The Selective Draft Act of May 18, 1917 (chapter 15, § 4, 40 Stat. 78 [50 USCA § 226 note]), provides that a person whose religious convictions are against war or participation therein shall not be required or compelled to serve in any of the forces, but will be subject to render services of a non-

combatant nature. This federal legislation is indicative of the actual operation of the principles of the Constitution, that a person with conscientious or religious scruples need not bear arms, although, as a member of society, he may be obliged to render services of a noncombatant nature. The general policy always has been to avoid with care any compulsion which infringes on the religious scruples of any one. "Even in the important matter of bearing arms for the public defense, those who cannot in conscience take part are excused, and their proportion of this great and sometimes imperative burden is borne by the rest of the community." Cooley, Constitutional Limitations (8th Ed.) vol. 2, p. 983, 984.

■ A citizen sharing views which amount to conscientious or religious scruples against bearing arms in what he regards as an unjustified war is akin to one having conscientious scruples against all wars. There is a distinction between a morally justified and an unjustified war, as recognized in international law. Vattel, Law of Nations, book III, c. 3, §§ 24, 29, 33, 34, 39; Hall, International Law (8th Ed.) c. 3, § 16; Wheaton, International Law (6th Ed.) vol. 2, p. 630; Oppenheim, International Law (4th Ed.) vol. 2, § 63, p. 130. Such recognition was given in the recent Kellogg Pact. It strongly lies in the desire to maintain peace and abolish war. Story in his work on the Constitution, vol. II, § 1876, says: "The rights of conscience are, indeed, beyond the just reach of any human power. They are given by God and cannot be encroached upon by human authority, without a criminal disobedience of the precepts of natural, as well as revealed religion." The rights of conscience are unalienable, which the citizen need not surrender and which the government or society cannot take away.

" 'Every individual has a *natural* and *unalienable* right to worship God, according to the dictates of his own conscience and reason;' and it is also his 'natural and unalienable right' not to be 'hurt, molested, or restrained in his person, liberty, or estate, for worshiping God in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession, sentiments, or persuasion,' provided he does not disturb others." Hale v. Everett, 53 N. H. 9, 60, 16 Am. Rep. 82.

■ When a citizen does not bear arms without obstructing the prosecution of a war or attempting to influence others, there is no act against society. The government will not

---

Oct. 1780, c. 33, § 2; Act Oct. 1780, c. 43, §§ 6, 19; Act May, 1781, c. 15, § 7; Act Nov. 1781, c. 28, §§ 14–16. Massachusetts: Resolve June 16, 1781, c. 38, Laws, and Resolves, 1780–1781, p. 621. New Hampshire: Act January 18, 1777, c. 5, Metcalf's Ed. vol. 4, Laws, p. 77; Act of June 26, 1779, c. 10, Laws supra, p. 219; Act of June 16, 1780, c. 3, Laws, supra, p. 293; Act June 27, 1780, c. 13, Laws, supra, 304. North Carolina: Laws November, 1777, c. 19; State Records, vol. 23, p. 128; Laws of April, 1778, 1st Sess., c. 1, State Records, vol. 24, p. 154; Laws of November, 1779, c. 1, State Records, vol. 24, p. 262; Laws 1781, c. 1, State Records, vol. 24, p. 362; c. 10, State Records, vol. 24, p. 404. South Carolina: 1778, v. 4, St. L. p. 410, No. 1075, amended by Act of October 9, 1778, No. 1103, 4 Stat. 453. Virginia: Act May, 1777, c. 2, 9 Hen. 276, 277; Act October 1777, c. 1, 9 Hen. 338–341; Act October, 1778, c. 45, 9 Hen. 588; Act May, 1779, c. 19, 10 Hen. 82; Act October, 1779, c. 50, 10 Hen. 214; Act May, 1780, c. 12, 10 Hen. 259; Act October, 1780, c. 3, 10 Hen. 326, 333; Act May, 1782, c. 3, 11 Hen. 14.

[2] Constitution of Alabama, 1819; Arkansas, 1868; Colorado, 1876; Florida, 1868; Idaho, 1889; Illinois, 1818, 1870; Indiana, 1816; Iowa, 1846 and 1857; Kansas, 1855, 1857; Kentucky, 1792, 1799; Louisiana, 1879, 1898; Maine, 1819; Maryland, 1864; Michigan, 1850; Mississippi, 1817; Missouri, 1820, 1865, 1875; New Hampshire, 1792; New York, 1821, 1846, 1894; North Carolina, 1868, 1876; Pennsylvania, 1790, 1838, 1873; South Carolina, 1895; Vermont, 1793.

go to the extent of forcing a citizen with conscientious or religious scruples to take up arms and commit what seem offenses to that citizen entering into warfare. The Supreme Court has said that this is a "religious nation" (Church of Holy Trinity v. United States, 143 U. S. 457, 470, 12 S. Ct. 511, 516, 36 L. Ed. 226), and that "the genius and character of our institutions are peaceful" (Fleming v. Page, 9 How. [50 U. S.] 603, 614, 13 L. Ed. 276). A person's declination to bear arms is not an act against peace and good order, nor contrary to the Constitution and laws of the United States, if such refusal be based upon conscientious scruples against the practice. Membership in a sect whose religious principles forbid bearing arms in warfare may be strong evidence of possessing conscientious scruples against warfare, but it is not essential to one having religious scruples asserting refusal to military service if such scruples be honestly held. Davis v. Beason, 133 U. S. 333, 10 S. Ct. 299, 33 L. Ed. 637; Church of Jesus Christ v. United States, 136 U. S. 1, 10 S. Ct. 792, 34 L. Ed. 478.

An examination of the stipulation of facts in this record justifies the argument of the appellant that his qualified answer to question No. 22 is intended only to preserve to him the right to exercise his conscientious or religious scruples when a war is declared and he is asked to bear arms. As we have seen, this is not in disobedience of the Constitution or the laws of the land.

No more is demanded of an alien who becomes a citizen than a natural-born citizen, and, when an alien becomes a citizen, he is accorded all the rights and privileges afforded to a natural-born citizen except eligibility to the presidency. Osborn v. Bank of U. S., 9 Wheat. (22 U. S.) 738, 6 L. Ed. 204; Boyd v. Thayer, 143 U. S. 135, 12 S. Ct. 375, 36 L. Ed. 103; Luria v. United States, 231 U. S. 9, 34 S. Ct. 10, 58 L. Ed. 101; Tutun v. United States, 270 U. S. 568, 46 S. Ct. 425, 70 L. Ed. 738.

The question presented here differs from that presented in the case of United States v. Schwimmer, supra. She stated she was an absolute atheist, and said, "I am not willing to bear arms," but she was willing to do everything that an American citizen must do except fight. This applicant was willing to bear arms, and reserved merely the right to determine for himself only whether the war was justified according to the dictates of his conscience. Mrs. Schwimmer said she was an uncompromising pacifist, and was found to have no sense of nationalism, but only a cosmic sense of belonging to the human family, and opposed the use of military force as admitted by the Constitution and by the laws. She had "no nationalistic feeling." The appellant, on the other hand, was willing to give the United States "all the allegiance he ever had given or could give to any country," but that he would not put allegiance to the government of any country before his "allegiance to the will of God." This appellant, from his answers, indicates an upright sense of obligation to his God, and has carefully explained his willingness to be a citizen of the United States, assuming the responsibilities and obligations of its form of government, and at the same time he has a high regard for his general duty to humanity. He wishes to keep pure his religious scruples.

Appellant's application for citizenship should have been granted. The order is reversed, with directions to the District Court to admit appellant to citizenship.

Order reversed.