## UNITED STATES v. GIROUARD.

### No. 4058.

Circuit Court of Appeals, First Circuit.

June 1, 1945.

Arthur J. B. Cartier, Asst. U. S. Atty., and Edmund J. Brandon, U. S. Atty., all of Boston, Mass., for appellant.

William J. Fitzsimons and David J. Coddaire, both of Boston, Mass., for appellee.

Before MAHONEY and WOODBURY, Circuit Judges, and HEALEY, District Judge.

MAHONEY, Circuit Judge.

The question here is whether a conscientious objector who is willing to serve as a noncombatant in the armed forces of the United States but unwilling to bear arms in its defense may be admitted to citizenship.

The appellee was born in Canada in 1902 and came to this country in 1923. In his declaration of intention to become a citizen of the United States, which he filed in the District Court at Boston on August 8, 1940, he described himself as an engineer with residence at Stoneham, Massachusetts, where he lives with his wife and daughter. He stated on the preliminary form of petition for naturalization that he understood the principles of the government of the United States, believed in its form of government and was willing to take the oath of allegiance in the following form: "I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely without any mental reservation or purpose of evasion: So Help Me God."

His answer to the question "If necessary, are you willing to take up arms in defense of this country?" was "No (non combatant) Seventh Day Adventist". He is of good moral character, well disposed to the good order and happiness of the United States and is not affiliated with any organization opposed to organized government. In a sworn statement before the Acting Naturalization Examiner on March 9, 1943, he stated that it was a purely religious matter with him, and in a questionnaire filed with Local Draft Board No. 161 he claimed exemption from combatant or non-combatant military service as a conscientious objector. At a hearing before the District Court all this evidence was submitted together with the testimony of the appellee that he was a member of the Seventh Day Adventist sect. He said that there were about ten thousand of this sect serving in the armed forces of the United States as noncombatants, especially in the medical corps, and that he was willing to serve in the army as a non-combatant but would not bear arms. The court admitted him to citizenship and entered the following order: "That since the Selective Service and Training Act permits, as a matter of right, an applicant for the draft to express a willingness to serve in the armed forces of the United States, but as a non-combatant, then this petitioner by exercising that right is still a person who can take an unqualified oath of allegiance to the United States, and is therefore eligible to citizenship." We think that the lower court was in error.

Naturalization is a privilege which is offered to any alien who desires to become a citizen, but it is a privilege subject to conditions which have been prescribed by Congress and with which the petitioner for citizenship must strictly comply. Congress is empowered by the Constitution to provide for the naturalization of aliens and the fact that it has always thought that naturalization is to be granted only after great care and consideration is evidenced by an examination of the strict requirements which it has declared the petitioner must meet. Among the conditions which he must fulfill and the obligations which he must undertake are those contained in the oath of allegiance which he takes before being admitted to citizenship.

The Supreme Court has interpreted that oath to mean that the petitioner is willing to bear arms in defense of this country and unless he takes an oath so interpreted the petition is to be dismissed and the privilege of citizenship denied. In United States v. Schwimmer, 1929, 279 U.S. 644, 651, 49 S.Ct. 448, 450, 73 L.Ed. 889, the applicant for citizenship was a woman born in Hungary. Her preliminary examination showed that she was an uncompromising pacifist with no sense of nationalism, "only a cosmic consciousness of belonging to the human family." She was a linguist, lecturer and writer, well educated and accustomed to discuss government and civic affairs. She was opposed to undemocratic institu-

tions and wanted to become a citizen of a country whose principles were in harmony with her ideals but was not willing to take up arms in its defense. The Court in reversing the Circuit Court of Appeals and affirming the District Court, which had denied her petition, said:

"That it is the duty of citizens by force of arms to defend our government against all enemies whenever necessity arises is a fundamental principle of the Constitution. * * *

"Whatever tends to lessen the willingness of citizens to discharge their duty to bear arms in the country's defense detracts from the strength and safety of the government. And their opinions and beliefs as well as their behavior indicating a disposition to hinder in the performance of that duty are subjects of inquiry under the statutory provisions governing naturalization and are of vital importance, for if all or a large number of citizens oppose such defense the 'good order and happiness' of the United States cannot long endure. And it is evident that the views of applicants for naturalization in respect of such matters may not be disregarded. The influence of conscientious objectors against the use of military force in defense of the principles of our government is apt to be more detrimental than their mere refusal to bear arms. The fact that, by reason of sex, age or other cause, they may be unfit to serve does not lessen their purpose or power to influence others."

The case of United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 573, 75 L.Ed. 1302, followed in 1931. There the petitioner for naturalization came to this country from Canada. He was a Baptist minister and a member of the faculty of the Divinity School at Yale University. In the first World War he was a chaplain with the Canadian Army and served with the American Y. M. C. A. He stated that he was willing to take the prescribed oath but that he was not willing to take up arms unless he believed that the war was morally justified; that his first allegiance was to the will of God; and that "he could not put allegiance to the government of any country before allegiance to the will of God." Here, too, the Supreme Court reversed the Circuit Court of Appeals and affirmed the District Court's action in dismissing the petition. It held:

" * * * The conscientious objector is relieved from the obligation to bear arms in obedience to no constitutional provision, express or implied; but because, and only because, it has accorded with the policy of Congress thus to relieve him. The alien, when he becomes a naturalized citizen, acquires, with one exception, every right possessed under the Constitution by those citizens who are native-born (Luria v. United States, 231 U.S. 9, 22, 34 S.Ct. 10, 58 L.Ed. 101); but he acquires no more. The privilege of the native-born conscientious objector to avoid bearing arms comes, not from the Constitution, but from the acts of Congress. That body may grant or withhold the exemption as in its wisdom it sees fit; and, if it be withheld, the native-born conscientious objector cannot successfully assert the privilege. No other conclusion is compatible with the well-nigh limitless extent of the war powers as above illustrated, which include, by necessary implication, the power, in the last extremity, to compel the armed service of any citizen in the land, without regard to his objections or his views in respect of the justice or morality of the particular war or of war in general. * * *

"When he speaks of putting his allegiance to the will of God above his allegiance to the government, it is evident, in the light of his entire statement, that he means to make his own interpretation of the will of God the decisive test which shall conclude the government and stay its hand. We are a Christian people (Holy Trinity Church v. United States, 143 U.S. 457, 470, 471, 12 S.Ct. 511, 36 L.Ed. 226), according to one another the equal right of religious freedom, and acknowledging with reverence the duty of obedience to the will of God. But, also, we are a nation with the duty to survive; a nation whose Constitution contemplates war as well as peace; whose government must go forward upon the assumption, and safely can proceed upon no other, that unqualified allegiance to the nation and submission and obedience to the laws of the land, as well those made for war as those made for peace, are not inconsistent with the will of God."

United States v. Bland, 1931, 283 U.S. 636, 51 S.Ct. 569, 570, 75 L.Ed. 1319 was decided at the same time as the Macintosh case. There the applicant for citizenship was a native of Canada who had served this country as a nurse in the first World War. She refused to bear arms in defense of the United States under any circumstances and was unwilling to take the

oath unless the words "as far as my conscience as a Christian will allow" were written into it. Again the Supreme Court reversed the Circuit Court of Appeals and sustained the District Court's dismissal of the application. It rendered its decision in accordance with the opinion in the Macintosh case and said that "The words of the statute do not admit of the qualification upon which the applicant insists."

■ It is true that these decisions were by a divided court but until they are over-ruled by the court itself or Congress enacts legislation which gives to the oath a meaning contrary to the interpretation placed upon it by the court, we are bound to accept the law as promulgated by these decisions. The facts in the instant case bring it squarely within the principles of these cases.

■ The District Court, however, took the view that any person subject to the draft who by reason of religious training or belief is conscientiously opposed to war may state his willingness to serve in the armed forces but as a non-combatant under § 5(g) of the Selective Training and Service Act of 1940, 54 Stat. 887, 50 U.S.C.A.Appendix, §§ 301 et seq., 305(g), and is entitled to take the oath. But the permission given to a conscientious objector, alien as well as citizen, to express his willingness to serve in the armed forces of the United States as a non-combatant, does not mean that the applicant for citizenship is not required to take an oath to bear arms in defense of this country. The naturalization laws make certain requirements of the applicant for citizenship and the consideration given to him as a draftee under the Selective Training and Service Act does not lessen those requirements.

When Congress passed the Nationality Act of 1940, 54 Stat. 1137, 8 U.S.C.A. § 501 et seq., it reenacted the same oath of allegiance and did not change in any way the interpretation placed upon it by the Supreme Court. However, by an amendment to that Act in 1942, 56 Stat. 182, 183, 8 U.S.C.A. §§ 1001, 1004, it excused "any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war" and who has been lawfully admitted to the United States, from filing a declaration of intention, and from the residence and educational requirements. No change was made in the oath of allegiance. It was also stated that the provisions of the amendment shall not apply to "any conscientious objector who performed no military duty whatever or refused to wear the uniform."

In In re Kinloch, D.C., 53 F.Supp. 521, two British subjects applied for citizenship. They were classified as conscientious objectors for non-combatant service. At the time of their applications they were members of a medical unit of the army. The court granted their applications and admitted them to citizenship. It reasoned that by Congressional enactment it was provided that these and similarly situated applicants were entitled to citizenship by virtue of becoming members of the armed forces of the United States. It stated that to require them to take an oath which means that they are willing to bear arms would destroy the purpose of the amendment and make it meaningless.

■ Since the appellee has not served in the armed forces he is definitely denied the benefits of this amendment. But it is urged that the amendment has inferentially changed the meaning of the oath of allegiance as promulgated in the Schwimmer, Macintosh and Bland cases and any conscientious objector may become a citizen by taking an oath which does not mean that he is willing to bear arms.

Congress, we think, in passing this amendment, intended to reward the conscientious objectors who had served or were serving in the armed forces by allowing them to take an oath which did not conflict with their religious scruples. It has passed no legislation expressly changing the meaning as interpreted by the Supreme Court, and we do not believe that it intended to extend this reward beyond this particular group. We do not think that it meant to give the benefit of such an inferential change in the meaning of the oath of allegiance to any alien conscientious objector who like the appellee here has not served and is not serving in the armed forces, or to conscientious objectors opposed to participate in non-combatant service who have been assigned to work of national importance under civilian direction. Since the petitioner is not willing to bear arms in defense of the United States, his petition must be denied.

The order of the District Court is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.

WOODBURY, Circuit Judge (dissenting).

I think the order of the District Court should be affirmed.

The inclusion in the preliminary application for naturalization of the question with respect to willingness to take up arms in defense of this country rested originally upon administrative, not legislative, action. Congress in §§ 4, 7, and 8 of the Naturalization Act of 1906, 34 Stat. 596, in specifying the requirements for admission to citizenship by naturalization did not see fit to include one calling for a statement of willingness to take human life in defense of the United States. Nevertheless a majority of the Supreme Court in the Schwimmer, Macintosh and Bland cases found such a requirement in the provision of § 4, Third of the Act of 1906, now § 335(a) (3), (4) of the Nationality Act of 1940, 54 Stat. 1157, 8 U.S.C.A. § 735(a) (3), (4), which provides that an alien applicant for citizenship must before admission declare on oath in open court that he will "support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and * * * bear true faith and allegiance to the same." The majority took the view that a pacifist coud not take an oath couched in the terms quoted without mental reservation.

Following these decisions Congress passed the Nationality Act of 1940, 54 Stat. 1137, 8 U.S.C.A. § 501 et seq., "To revise and codify the nationality laws of the United States into a comprehensive nationality code." By it Congress did not alter the terms of the oath of allegiance and so by inference it might be said to have adopted the interpretation placed upon the oath by the Supreme Court in the cases just referred to. But this inference seems to me to lose persuasive force by reason of the fact that Congress in its revision and codification did not include, when adding many new requirements for eligibility to citizenship by naturalization, a specific one of willingness to bear arms, but instead permitted that requirement still to stand on an interpretation of the oath of allegiance by a closely divided court. It seems to me in consequence that no persuasive inference of Congressional adoption of the judicial interpretation of the oath of allegiance in the Schwimmer, Macintosh and Bland cases can safely be drawn from the Nationality Act of 1940. It seems to me that the permissible inferences from that statute neutralize one another.

Then I find in the amendment of the above act passed on March 27, 1942, 56 Stat. 182, 183, 8 U.S.C.A. § 1001 et seq., positive evidence that Congress has changed the interpretation put upon the oath of allegiance by the Supreme Court in the Schwimmer, Macintosh and Bland cases to the extent of making it possible for persons who share the petitioner's religious scruples to take it without mental reservation. By the amendment a new title was added to the 1940 Act, the effect of which is to simplify and expedite naturalization for "any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war," (and who has been lawfully admitted) by excusing such persons from filing a declaration of intention to become a citizen and relieving them of the residence and educational requirements. It is true that the petitioner cannot take advantage of the special provisions of this amendment because he has not served in the military or naval forces. He is not trying to. But it applies to any person with service therein and therefore it applies to those with service in a non-combatant, as well as to those with service in a combatant capacity. In re Kinloch, D.C., 53 F.Supp. 521. Certainly it cannot be said that one in the medical corps of the army or the hospital corps of the navy is not serving respectively "in the military or naval forces of the United States." Thus the amendment applies to those who share the petitioner's scruples, if they have been called upon and have served in a capacity permitted by their scruples, and, since the amendment does not change the oath of allegiance, it would seem to follow that Congress has by necessary implication expressed its intention that one who believes as the petitioner does can take that oath without reservation. It would be strangely inconsistent if Congress permitted conscientious objectors to elect service in a non-combatant capacity, gave persons so serving, if aliens, advantages in obtaining citizenship by naturalization, and then required them to take an oath actually to bear arms in defense of the United States.

The interpretation placed upon this amendment by my associates seems to me to accord to Congress an intention to have the words of the oath mean one thing to a person who is willing to serve and has

served in the military forces to the extent permitted by his scruples, and something else to one equally willing to serve but who for reasons of age, sex, dependency or physical unfitness has not been called upon or permitted to do so. I think Congress must have intended the words of the oath to mean the same thing to one who has served in the military or naval forces as they do to one who has not.

I would even be willing myself to go further and affirm the order of the court below on a still broader ground. I would be willing to recognize frankly that the case at bar is rule in principle by the Schwimmer, Macintosh and Bland cases, but decline to follow them.

In taking this course I recognize my duty as an inferior federal judge to accept and follow controlling decisions of the Supreme Court of the United States whether I personally agree with those decisions or whether I do not. I fully appreciate that federal law would soon become chaotic if judges such as I should do otherwise. But I do not believe that as a consequence of this we on this court are under a positive duty always to follow blindly.

Like all appellate courts I conceive it to be our judicial duty to decide cases as we think they should be decided, but as an intermediate appellate court one of the factors, and a highly important one, for us to take into consideration in concluding how we should decide a case is the view which we think the Supreme Court would take on the question at issue before us. Nothing is to be gained by our deciding a question contrary to the way we think the Supreme Court would decide it. And to determine how the Supreme Court would decide a question we ordinarily would follow and apply unreversed decisions of that court in point. But as Judge Parker said in Barnette v. West Virginia State Board of Education, D. C., 47 F.Supp. 251, 253, "decisions are but evidences of the law and not the law itself," and although I frankly concede that in the vast majority of cases decisions of the Supreme Court constitute so far as we are concerned conclusive "evidences of the law," nevertheless on rare occasions, and I think this is one of them, situations arise when in the exercise to the best of our ability of the duty to prophesy thrust upon us by our position in the federal judicial system we must conclude that dissenting opinions of the past express the law of today. When this situation arises

and we do not agree with decisions of the Supreme Court I think it our duty to decline to follow such decisions and instead to follow reasoning with which we agree. As I see it this is the situation which confronts us here.

Fundamentally the question presented is one of statutory construction. It is whether Congress, as a condition of admission to citizenship by naturalization, requires an applicant to state under oath that he is willing actually to take up arms in defense of this country. In other words, is it the Congressional will that aliens otherwise qualified be denied admission to citizenship if conscientiously opposed to taking life in war?

As already appears the Supreme Court has three times answered this question in the affirmative. But in the Schwimmer case, Mr. Justice Holmes, speaking for himself and Mr. Justice Brandeis, dissented on the ground that the applicant, being a woman over fifty years of age, "would not be allowed to bear arms if she wanted to," and for the further reason that he could not see that a belief in pacifism made it impossible to subscribe wholeheartedly to the oath required. Mr. Justice Sanford, who also dissented, agreed in substance with the views of the Circuit Court of Appeals (7 Cir., 27 F.2d 742, 744) which can be summarized by the quotation "A petitioner's rights are not to be determined by putting conundrums to her."

In the next case in which the Supreme Court considered the question, (United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 576, 75 L.Ed. 1302) Mr. Chief Justice Hughes, and Associate Justices Holmes, Brandeis, and Stone dissented. Speaking through the then Chief Justice, the dissenters conceded that naturalization is a privilege which Congress could grant or withhold on such conditions as it might impose; that Congress could constitutionally compel service in the armed forces by whomsoever it might select regardless of religious scruples, and from this they were willing to assume that Congress had authority to exact a promise to bear arms as a condition to its grant of naturalization. But they did not find evidence in the statute indicating that Congress had exacted such a promise. They noted the omission from the statute of any express requirement of a promise to bear arms, said that the question "is whether the exaction is to be implied from certain general words" which

they did not think "either literally or historically, demand the implication," and then said: "If such a promise is to be demanded, contrary to principles which have been respected as fundamental, the Congress should exact it in unequivocal terms, and we should not, by judicial decision, attempt to perform * * * a legislative function."

In detail the dissenting Justices reasoned thus: On examining the statute they found certain specific requirements with regard to the opinions and conduct of applicants for citizenship but among them found none "to the effect that one shall not be naturalized if by reason of his religious convictions he is opposed to war or is unwilling to promise to bear arms." They considered this omission "highly significant." Next they examined the facts, and from that examination concluded that the petitioner had fully satisfied all the specific statutory requirements, and then they said that "The principal ground for exclusion appears to relate to the terms of the oath which the applicant must take." They said: "The question then is whether the terms of the oath are to be taken as necessarily implying an assurance of willingness to bear arms, so that one whose conscientious convictions or belief of supreme allegiance to the will of God will not permit him to make such an absolute promise cannot take the oath and hence is disqualified for admission to citizenship."

The dissenting Justices then compared the wording of the oath of allegiance with the wording of the oath prescribed by Congress under Art. VI, clause 3 of the Constitution for civil officers generally (except the President); found the terms of the oaths substantially similar; said that it went without saying that it was not the intent of Congress in framing the latter oath to impose any religious test; and found "it impossible to conclude," in view of the history of the struggle for religious liberty, that Congress intended that persons with religious scruples against bearing arms should be disqualified from holding public office. Next the Justices noted that "There are other and most important methods of defense, even in time of war, apart from the personal bearing of arms," and that "a promise to engage in war by bearing arms, or thus to engage in a war believed to be unjust, would be contrary to the tenets of religious groups among our citizens who are of patriotic purpose and exemplary conduct." The dissenting opinion then continues as follows:

"To conclude that the general oath of office is to be interpreted as disregarding the religious scruples of these citizens and as disqualifying them for office because they could not take the oath with such an interpretation would, I believe, be generally regarded as contrary not only to the specific intent of the Congress but as repugnant to the fundamental principle of representative government.

"But the naturalization oath is in substantially the same terms as the oath of office to which I have referred. I find no ground for saying that these words are to be interpreted differently in the two cases. On the contrary, when the Congress reproduced the historic words of the oath of office in the naturalization oath, I should suppose that, according to familiar rules of interpretation, they should be deemed to carry the same significance."

Following this the dissenting Justices noted that the policy of granting exemptions from military service to conscientious objectors had been consistently followed since colonial times,[1] and said that "the long-established practice of excusing from military service those whose religious convictions oppose it confirms the view that the Congress in the terms of the oath did not intend to require a promise to give such service." Next the dissenters admitted "that duty to the state exists within the domain of power, for government may enforce obedience to laws regardless of scruples. When one's belief collides with the power of the state, the latter is supreme within its sphere and submission or punishment follows." "But" they said, "in the forum of conscience, duty to a moral power higher than the state has always been maintained," and "There is abundant room for enforcing the requisite authority of law as it is enacted and requires obedience, and for maintaining the conception of the supremacy of law as essential to orderly government, without demanding that either citizens or applicants for citizenship shall assume by oath an obligation to regard allegiance to God as subordinate to allegiance to civil power." They found no

---

[1] For a citation of authorities supporting this proposition see the opinion of the Circuit Court of Appeals in the Macintosh case, 2 Cir., 42 F.2d 845, 847, 848.

ground for excluding Macintosh from admission to citizenship because his conscientious scruples had reference only to wars which he himself believed to be unjust, and they concluded by expressing the view that the Schwimmer case stood upon its own special facts and that the judgment therein did not require reversal in the case they were considering.

No discussion of importance is contained in the dissenting opinion filed in the third case of the trilogy, United States v. Bland, 283 U.S. 636, 51 S.Ct. 569, 75 L.Ed. 1319, decided contemporaneously with the Macintosh case. In it the Supreme Court divided in the same way that it did in the Macintosh case and for the reasons therein expressed.

If I were to decide the question of law before us here de novo I would be disposed to follow the reasoning of the dissenting opinions in the Schwimmer, Macintosh and Bland cases and the decisions of the circuit courts of appeals reversed therein.[2] In the absence of an express statutory provision I find it hard to believe that Congress intended to deny citizenship by naturalization to members of sects such as the Quakers (and I think the same may be said of Seventh Day Adventists) who, as Mr. Justice Holmes observed in his dissent in the Schwimmer case, "have done their share to make the country what it is." It seems to me that interpreting the oath of allegiance in its historical setting, in connection with other statutes, and in conformity with the First Amendment, Congress did not intend in it to exact an unconditional promise actually to bear arms in war, but instead intended to exact a promise to support and defend the Constitution and laws of the United States in whatever way and by such means as are appropriate to an applicant's sex, age, and capabilities, and are not in violation of an applicant's religious scruples or beliefs in so far as those scruples or beliefs are either protected by the Constitution or have been consistently respected by Congress. However, the three celebrated cases above have not been overruled, and since in principle they rule the case at bar, I would probably feel compelled to follow them were it not for my view that now the Supreme Court itself would not do so.

I concede that the indications of reversal are not as strong here as they were in the second flag salute case. Barnette v. West Virginia State Board of Education, D. C., 47 F.Supp. 251. But as already appears decisions of circuit courts of appeals were reversed by a divided Supreme Court in the Schwimmer, Macintosh and Bland cases, and in the two latter, the ones most nearly in point, by the narrowest margin, and the decisions reversed were fully, and I think convincingly reasoned and were unanimous. Thus there is a substantial body of judicial opinion opposed to that of the majority of the Supreme Court in the above cases. In view of this substantial body of opinion, in view of what I believe to be the intrinsic merit of that opinion, and in view of the many recent decisions of the Supreme Court giving broad definition to the scope of the guarantee of the free exercise of religion contained in the First Amendment,[3] I believe that the prediction can be ventured that the above cases are no longer expressive of the law. And I believe that this prediction can be ventured even resisting the temptation "to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant." Learned Hand dissenting, Spector Motor Service v. Walsh, 2 Cir., 139 F.2d 809, 823. Therefore I feel that we are not constrained to follow the Supreme Court cases cited last above.

2 7 Cir., 27 F.2d 742; 2 Cir., 42 F.2d 845; 2 Cir., 42 F.2d 842.

3 Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A. L.R. 1352; Jones v. Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514; reversed on rehearing 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290; Jamison v. Texas, 318 U.S. 413, 63 S. Ct. 669, 87 L.Ed. 869; Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81; Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; Taylor v. Mississippi, 319 U.S. 583, 63 S.Ct. 1200, 87 L.Ed. 1600; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L. R. 674; Follett v. McCormick, 321 U. S. 573, 64 S.Ct. 717, 88 L.Ed. 938.