## Application of WIEBE.
### No. 1717.

United States District Court
D. Nebraska, Lincoln Division.
Feb. 4, 1949.

Charles A. Rain, of Council Bluffs, Iowa, for the United States.

F. W. Carstens (of Carstens & Pickett), of Beatrice, Neb., for Jacob A. Wiebe, applicant.

DELEHANT, District Judge.

Jacob A. Wiebe (herein called the applicant), born October 27, 1918, of German ancestry in Russia, a Russian national residing in the United States since October 3, 1923, and now the husband of a citizen by birth of the United States, has applied for naturalization under Section 311 of the Nationality Act of 1940, Title 8 U.S.C.A. § 711.

The United States has filed a motion to dismiss his petition upon the ground that he "has failed to establish that he has been attached to the principles of the Constitution and well disposed to the good order and happiness of the United States for the period required by law". Section 307(a) of the Nationality Act of 1940, Title 8 U.S.C.A. § 707(a) (3). The sole question is the eligibility for citizenship of the applicant, notwithstanding his declared unwillingness, because of his religious convictions, to give more than a limited measure of service in defense of the constitution and laws of the United States.

The issue thus made has been submitted to the court upon certain portions of the departmental record on his application and upon the oral testimony of the applicant. The pertinent facts, which are simple and undisputed, may be stated briefly.

It is conceded that in all respects the applicant is worthy of citizenship unless he is barred from its reception by the following circumstances. He is, and since his birth has been, a member of the religious society known as the Mennonite church, one of whose tenets is the principle of nonresistance. He subscribes sincerely to that principle. In his petition he answered negatively the question, "If necessary, are you willing to take up arms in defense of this country?" In 1941, as a registrant under the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq., he claimed exemption from both combatant and noncombatant military service, but, also claiming occupational deferment as a farmer, was accorded a classification IIIa. In statements to immigrant inspectors incident to his present application, he signified his unwillingness, resting in religious scruples, to bear arms or to engage in non-

combatant activities as a member of any branch of the military service or to perform any work incident to international hostilities, which in its very nature is necessarily and directly of military significance, such as the making of arms or munitions, but his willingness during such an emergency to engage under civilian direction in any work of national importance, even though it might incidentally contribute to the military defense of the country, such as the production or preservation of food, supplies, machinery (exclusive of weapons) and the like. As a witness before the court, he reiterated his position, but added that, in the preservation during an international war of the nation's property he would willingly serve, though the general supervision of such effort were under military control, provided he should not be required to enter the military establishment; that he would gladly participate in any activity of national importance under civilian direction required by the nation of conscientious objectors to any and all military service; and that he would purchase bonds by which the country might raise money for the prosecution of a war, and contribute to service and welfare funds inspired by war.

The immediately applicable portion of the statute, Title 8 U.S.C.A. § 707(a) follows: *"No person,* except as hereinafter provided in this chapter, *shall be naturalized unless such petitioner,* (1) immediately preceding the date of filing petition for naturalization has resided continuously within the United States for at least five years and within the State in which the petitioner resided at the time of filing the petition for at least six months, (2) has resided continuously within the United States from the date of the petition up to the time of admission to citizenship, and (3) *during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."* (Emphasis added.)

Whether the scruples to which the applicant's religious convictions prompt him intercept his attachment to the principles of the Constitution and his appropriate disposition to the good order and happiness

of the United States is the burden of the court's inquiry.

In 1942, dealing with issues indistinguishable from those now before it, this court denied an earlier petition for admission to citizenship tendered by the applicant. Its action in that direction was believed to be compelled by the controlling authority of United States v. Schwimmer, 279 U.S. 644, 49 S.Ct. 448, 73 L.Ed. 889; United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302; and United States v. Bland, 283 U.S. 636, 51 S.Ct. 569, 75 L.Ed. 1319. And if the majority opinions in those cases were still entitled to authoritative recognition the present ruling would not depart from that made in 1942.

■ But the intervening seven years have witnessed changes. Within that period the minority (not in personnel, for the dissenters are dead, but rather in thought) in the Schwimmer, Macintosh and Bland cases has become the court; and its dissents have become the law. In Girouard v. United States, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084, those earlier cases were expressly overruled, and their dissenting opinions were cited copiously and followed. Therefore, a trial court, in a comparable proceeding, must now have regard principally to the prevailing opinion in the Girouard case, and to the dissents in the Schwimmer, Macintosh and Bland cases. And its thinking should be measurably fortified by the examination of the opinions of the Circuit Courts of Appeals in Schwimmer v. United States, 7 Cir., 27 F.2d 742; Macintosh v. United States, 2 Cir., 42 F.2d 845; and Bland v. United States, 2 Cir., 42 F.2d 842, which were all carefully considered and may now be said to have been restored to authoritative stature by the logic, if not the express language, of the majority opinion in the Girouard case.

The Girouard decision should not be regarded as an abrupt departure by the Supreme Court from a previously unvaried course. It is true that between the Macintosh and Bland rulings in 1930, and the Girouard opinion in 1946, no deliverance of that court in a naturalization proceeding had formally nullified its pronouncements in those earlier cases. But, in many other ap-

plications of the constitutional guaranty of religious freedom, or of freedom of speech or of the press, the court had expressed views that could not be reconciled with the thought of the majority holdings in the Schwimmer, Macintosh and Bland rulings. Among many others may be mentioned, Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; Cantwell v. Connecticut, 310 U. S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A. L.R. 1352; Jones v. City of Opelika, 319 U. S. 103, 63 S.Ct. 890, 87 L.Ed. 1290; Jamison v. State of Texas, 318 U.S. 413, 63 S. Ct. 669, 87 L.Ed. 869; Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81; Martin v. City of Struthers, Ohio, 319 U. S. 141, 63 S.Ct. 862, 87 L.Ed. 1313; Taylor v. State of Mississippi, 319 U.S. 583, 63 S. Ct. 1200, 87 L.Ed. 1600; West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A. L.R. 674; Follett v. Town of McCormick, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938, 152 A.L.R. 317; Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103; Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265; Tucker v. State of Texas, 326 U.S. 517, 66 S.Ct. 274, 90 L.Ed. 274. Of those rulings, some involved the explicit abandonment of positions theretofore taken and positively declared by that court. e. g. Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493; and Jones v. City of Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L. Ed. 1691, 141 A.L.R. 514.

The impact of such of those decisions as had been announced by the autumn of 1942 prompted Senior Circuit Judge Parker, speaking for a three judge court in Barnette v. West Virginia State Board of Education, D.C.W.Va., 47 F.Supp. 251, 253, to decline to follow Minersville School District v. Gobitis, supra, and to emphasize by illustration his observation that " * * * decisions are but evidences of the law and not the law itself". That view and the decision bottomed on it were affirmed by the Supreme Court in West Virginia State Board of Education v. Barnette, supra. In like spirit, and more directly upon the pres-

ent issue, Judge Woodbury, in 1945, in United States v. Girouard, 1 Cir., 149 F.2d 760, predicated his dissent from the denial of citizenship to Girouard upon the ground that, by the logic of the then more recent decisions of the Supreme Court, the majority holdings in the Schwimmer, Macintosh and Bland cases no longer reflected the law. His position prevailed in Girouard v. United States, supra.

Upon the present submission, the government correctly asserts that in the Girouard case the alien admitted to citizenship was one who was willing to take the oath of allegiance and to serve in the army as a noncombatant but, because of religious scruples, was unwilling to bear arms in defense of the United States. And it also reminds the court that (a) the Schwimmer case involved a fifty year old female nonreligious pacifist, without feelings of loyalty to any nation, who, upon her pacifist principles refused to signify her willingness to bear arms in defense of the United States but contended that she could, and offered to, take without qualification the prescribed oath of allegiance, (b) the Macintosh proceeding concerned a clergyman-teacher, who, while denying his adherence to the religious tenet of nonresistance, declined to promise in advance to bear arms in defense of the United States, unless he privately believed the position of this country inviting his defense to be morally justified, and (c) the Bland ruling was in respect of a female nurse, theretofore engaged in war nursing, who professed religious scruples against bearing arms in warfare.

And, in apparent recognition that, as the law is now understood, all of those applicants should be considered to have been entitled to citizenship, the United States argues that the present applicant does not bring himself within any rule that is deducible from their cases whether they be regarded separately or in combination. With that view this court cannot agree. The reach of the Girouard case and the dissenting opinions in the Schwimmer, Macintosh and Bland cases is not to be limited narrowly and grudgingly to the precise details of abstinence from combat upon which the several applicants in them felt impelled to insist. What is vindicated in those

opinions is the right to our citizenship of an applicant, otherwise worthy thereof in all respects, who insists upon the implicit, though not formal, excision from his pledge "to support and defend the Constitution and laws of the United States of America" of any individual commitment in advance on his part to engage in such methods of support and defense as would violate his conscience. Such an applicant asks for that only which native citizens of the United States sharing his opinions, undoubtedly possess, namely the privilege, if and when warfare impends or occurs and military service of our citizenry is imperative, of asserting those opinions and seeking such preferential treatment as at the time the then prevailing legislation may accord to them. He merely further forecasts the probable nature and extent of the claim which, as he now thinks, he will be constrained to present if and when the emergent occasion arises. Usually, his conscientious scruples are rooted in religion, as was the case in the Girouard, Macintosh and Bland proceedings. But they may exist despite a complete detachment from formal religion, as seems to have been the situation with Mrs. Schwimmer.

It is true that the cited opinions discuss at length unwillingness to bear arms, for it was that especially upon which their several applicants insisted. But their reasoning and discussion proceed much farther. Can it be possible that scruples, resting in a perfectly sincere conscience, against the bearing of arms, but not against noncombatant service under military direction and in military uniform, will not bar one from citizenship, Girouard v. United States, supra; In re Kinloch, D.C.Wash., 53 F.Supp. 521; In re Sawyer, D.C.Del., 59 F.Supp. 428, but that scruples, equally authentic, against any military participation, but not against work of national importance under civilian direction (See Title 50 U.S.C.A. Appendix, § 305(g) must defeat an application for such citizenship? This court thinks not. In the recent military emergency the congress saw fit to allow, in the section of the statute last cited, for both types of conscientious objection and to provide for national service by their adherents appropriate to their respective spiritual po-

sitions. Nor, as it would seem, should an applicant be barred from citizenship, under the reasoning of the finally prevailing opinions of the justices of the supreme court upon the subject, because his religious principles bring him to their logical extremity, and counsel his abstinence from work directly oriented to the business of killing, or whose product is naturally and necessarily designed for military use. Military operations and munitions making aside, there still remains a vast area of useful service to one's country in a season of war, to which the applicant appears to be willing to devote his energies under governmental auspices but by civilian direction. Girouard v. United States, supra. And since he signifies his willingness to engage in them, he should not be barred from citizenship. Their selection and direction may be left to the wisdom and discretion of the congress if and when the necessity for them shall hereafter unfortunately arise.

Another feature ought not altogether to be overlooked. This applicant is not a brilliant scholar and veteran lecturer, with a penchant for social agitation, as Mrs. Schwimmer was; or, like Doctor Macintosh, a learned student and Professor of Divinity; or as Marie Averil Bland, the child of a scholarly English speaking father, a trained nurse with the educational advantage of travel. He is a native of Russia, the medium of conversation in whose earliest home was the German language, a farmer, and entirely of rural background from birth. His education is adequate for the demands of his occupation and manner of living, but not extensive or elaborate. In this proceeding he acted without counsel throughout the period of the departmental inquiry into his application, and until the issues were ready for presentation to the court. In that setting, the court is unwilling to appraise his responses to investigatory questions too narrowly or to hold him to drastic account for every incautious word, which might be appropriate in an inquiry into the mental and spiritual position of one apt for fine distinctions in oral or written expression.

Upon the sincerity of the applicant's professed scruples, no issue is made. Nor could one be substantiated. His religious

134

principles are not newly formed or acquired. He was born into an atmosphere of which they were an intimate and essential part. They have conditioned his life from that instant until the present hour; and because of their uniquity in the several communities in which he has lived, have undergone an intelligible confirmation and intensification. The tenet of nonresistance, in the sense that he cherishes it, has a long and striking history. Omitting its many earlier assertions in the record of religious dissidence, it was, at least implicitly, one of the convictions which prompted Menno Simons more than four hundred years ago to renounce his Catholic priesthood and to lead a company of sympathetic followers into the sect which came eventually to be known by his Christian name. Succeeding generations of their spiritual descendants have undergone repression and persecution in many lands and have wandered from nation to nation in quest of hospitality to their pacific doctrine. Their memories and sacrifices and sorrows, and their fortified convictions, are a part of the applicant's spiritual heritage, a mighty instrumentality in his interior making. One may, to be sure, completely reject the thesis of nonresistance which he cherishes, though in the rejection he will surely be led to wonder whether today's uneasy world might not be more tranquil if it were universally entertained and practiced. But he may not with fidelity to our American way of thinking deny the applicant's right sincerely to subscribe to it, or chastise or repress him for the exercise of that right.

■ With an adequate understanding of the applicant's attitude towards the burden of the defense of the Constitution and laws of the United States against all enemies, which his solemn affirmation of allegiance and his long pursued citizenship will impose upon him, this court is satisfied that he measures up to the tests of the cited opinions. He has declared with candor that his religious principles will compel him in the event of future warfare to seek absolution from those aspects of that defense which either are themselves military or are of such nature as naturally and necessarily to contribute to military operations. He does not demand, and no alien in quest of citizenship may exact, a compact with the nation whereunder the government will pledge itself hereafter and in all circumstances to grant that absolution. In that behalf he must—and does—expect to stand with every other American citizen, whether native or naturalized, and to trust in the enlightened and sympathetic recognition by the congress, in each succeeding crisis, of the disparities in religious opinion which characterize the vast population of the country. Such trust has not heretofore been found ill placed. See dissenting opinion of Hughes, C. J. in United States v. Macintosh, supra, 283 U.S. page 633, 51 S.Ct. page 578, 75 L.Ed. 1302, and footnote 4 to opinion of court in Girouard v. United States, supra, 328 U.S. page 66, 66 S.Ct. page 828, 90 L.Ed. 1084.

Broadly appraised, the Girouard opinion, in association with the earlier dissents to which it adheres, rejects the contention that the timely assertion of a claim to such minimization of defensive service is a barrier to naturalization. And it is quite immaterial that none of those opinions deals with the precise limitations upon which the applicant insists. It is the claim to a preferential treatment in contrast with other citizens from whom the extremity of service may be required, which really matters. This court considers that it ought not to narrow the application of the now controlling decisions to the precise claims which they expressly sanction, but ought rather to administer them in harmony with their manifest spirit. The Supreme Court should not be compelled, by discordant inferior courts, to extend the obvious import of its ruling to one after another of a multitude of successive factual settings, and thus laboriously to erect a composite test for citizenship in cases of this nature, which, to this court at least, seems clearly to emerge from its existing opinions.

The motion to deny the application is being overruled, the application is being granted and the applicant is admitted to citizenship. Exception is allowed the United States.