## GEORGE v. UNITED STATES.

### No. 13095.

United States Court of Appeals,
Ninth Circuit.

April 21, 1952.

Rehearing Denied May 23, 1952.

Wirin, Rissman & Okrand and Richard W. Petherbridge, Los Angeles, Cal., for appellant.

Walter S. Binns, U. S. Atty., Ray H. Kinnison, Asst. U. S. Atty., Richard F. Hayden, Asst. U. S. Atty., all of Los Angeles, Cal., for appellee.

Before MATHEWS and ORR, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

The appellant, Joseph Harmon George, registered under the Selective Service Act of 1948, 50 U.S.C.A.Appendix, § 453. On May 9, 1951, an indictment was returned against him on two counts of violation of the Selective Service Act, 50 U.S.C.A.Appendix, § 462, charging him with (1) failure to report for induction and (2) failure to file a classification questionnaire. After waiver of jury, Rule 23(c), Federal Rules of Criminal Procedure, 18 U.S.C.A., and trial by the court, he was found guilty on both counts on June 13, 1951. On July 9, 1951, he was sentenced to imprisonment for a period of three years on each count of the indictment, the sentences to run concurrently.

The facts surrounding the offense are not in dispute. Indeed, the entire record on appeal consists of an agreed statement upon appeal made in accordance with the rules. Rule 39(b) (1), Federal Rules of Criminal Procedure; Rule 76, Federal Rules of Civil Procedure, 28 U.S.C.A.

Appellant was born on December 14, 1931. The violation charged in Count 1 of the indictment occurred on March 28, 1951; that in Count 2 on January 9, 1951.

In the court below, the defendant attacked the validity of the indictment on Constitutional grounds, on motion to dismiss, made under the rules. Rules 6(b) (2), 12(b) (1) and (2), Federal Rules of Criminal Procedure.

In this court, he challenges the conviction on the same grounds.

The most serious of these relates to his contention that the provision of the Selective Service Act of 1948 relating to the exemption of certain persons who, by rea-

son of religious training and belief, are conscientiously opposed to participation in war of any form, 50 U.S.C.A.Appendix, § 456(j), violates the guaranty of freedom of religion contained in the First Amendment to the Constitution of the United States.

▮ The argument is rather sketchy. It is difficult to ascertain whether the claimed violation consisted in making a law "respecting an establishment of religion" or whether it is a preference given to one religious group over another, which amounts to a prohibition of "the free exercise of religion" under the First Amendment. Whichever it is, it is untenable.

## I

### Conscience and the State.

The problem of religious pacifists is one which has troubled theologians, legislators and jurists in the United States for a long period of time. The problem becomes acute at war-time when the nation is confronted with those whose religious training and belief forbids participation in war in any form. (See, C. C. McCown, "Conscience and the State", 1944, 52 Cal.Law Rev., p. 1; Julien Cornell, "The Conscientious Objector and the Law", 1943; Julien Cornell, "Conscience and the State", 1944.) Early in the history of the colonies persecution and discrimination characterized the attitude of the community towards religious pacifists and dissenters such as the Quakers (James Truslow Adams, "Provincial Society 1690–1763," 1927, pp. 63–150; being in Vol. III of "A History of American Life", edited by Arthur M. Schlessigner and Dixon Ryan Fox; Evarts Bontell Green, "The Revolutionary Generation, 1761–1790," 1927, pp. 282–283; being Vol. IV in the same series). At the time of the establishment of the Constitution, and especially following its adoption, an era of greater tolerance came into being. It manifested itself by granting to religious pacifists exemption from military duty. The first Constitution of New York, adopted in 1777, exempted from the state militia

"all such of the inhabitants of this State being of the people called Quakers as, from scruples of conscience, may be averse to the bearing of arms, be therefrom excused by the legislature; and do pay to the State such sums of money, in lieu of their personal service, as the same may, in the judgment of the legislature, be worth." Art. XL quoted by Mr. Chief Justice Hughes in the dissenting opinion in United States v. Macintosh, 1931, 283 U.S. 605, 632–633, 51 S.Ct. 570, 578, 75 L.Ed. 1302.

Similar exemptions are found in some of the early constitutions of other colonies and in later state constitutions. Macintosh v. United States, 1930, 2 Cir., 42 F.2d 845, 847–848, Footnotes 1 and 2; and see references in the concurring opinion of Mr. Justice Cardozo in Hamilton v. Regents, 1934, 293 U.S. 245, 266–268, 55 S.Ct. 197, 79 L. Ed. 343.

The Selective Service Act of 1917 exempted from military service regular or duly ordained ministers of religion and

"students who at the time of the approval of this Act are preparing for the ministry in recognized theological or divinity schools".

And, in addition, it provided that nothing in the Act

"shall be construed to require or compel any person to serve in any of the forces herein provided for who is found to be a member of any well-recognized religious sect or organization at present organized and existing and whose existing creed or principles forbid its members to participate in war in any form and whose religious convictions are against war or participation therein in accordance with the creed or principles of said religious organizations," 40 Stat. 76, Chapter 15, Sec. 4.

Under this Act, except as to ordained ministers of religion and theological students, there is no recognition of individual conscientious objections. The exemption applies to persons who belong to a group which forbids participation in war, and whose own religious convictions accord with those of the group. The Selective Service Act of 1940, 50 U.S.C.A.Appendix,

§ 305(g), and the amended Act of 1948, 50 U.S.C.A.Appendix, § 456(j), introduced the personal element by making individual religious conviction the test whether the individual belongs to a group, the tenets of which forbade participation in war or not. The 1940 Act did not define religious training and belief. The 1948 Act does define it. As it now stands, the provision reads:

"Nothing contained in this title (Sections 451–454 and 455–471 of this Appendix) shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code." 50 U.S.C.A.Appendix, § 456(j).

The agreed statement of facts recites that the defendant believes in a Supreme Being. He insists, however, that having granted exemption on religious grounds, the Congress had no right to define "religious training and belief" or deny it to non-religious opponents of war. The appellant insists that the definition is restrictive and that by inserting it, the guarantees of the First Amendment are violated.

■■ If the contention be that the exemption was a law "respecting an establishment of religion," the answer was given emphatically by a unanimous court in Arver v. U. S. [Selective Draft Cases], 1918, 245 U.S. 366, 389–390, 38 S.Ct. 159, 165, 62 L.Ed. 349:

"And we pass without anything but statement the proposition that an establishment of a religion or an interference with the free exercise thereof repugnant to the First Amendment resulted from the exemption clauses of the act to which we at the outset referred because we think its unsoundness is too apparent to require us to do more."

It is established constitutional doctrine of long standing that exemptions of this character do not spring from the Constitution, but from the Congress. In Jacobson v. Commonwealth of Massachusetts, 1905, 197 U.S. 11, 29, 25 S.Ct. 358, 362, 49 L.Ed. 643, the Court adverted to the fact that, despite the liberties secured by the Fourteenth Amendment a person

"may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or *even his religious* or political convictions, to take his place in the ranks of the army of his country, and risk the chance of being shot down in its defense." (Emphasis added.)

In United States v. Macintosh, 1931, 283 U.S. 605, 624, 51 S.Ct. 570, 575, 75 L.Ed. 1302, Mr. Justice Sutherland, writing for the majority of the Court, stated

"the privilege of the native-born conscientious objector to avoid bearing arms comes, not from the Constitution, but from the acts of Congress. That body may grant or withhold the exemption as in its wisdom it sees fit; and, if it be withheld, the native-born conscientious objector cannot successfully assert the privilege. No other conclusion is compatible with the well-nigh limitless extent of the war powers as above illustrated, which include, by necessary implication, the power, in the last extremity, to compel the armed service of any citizen in the land, without regard to his objections or his views in respect of the justice or morality of the particular war or of war in general."

(And see, In re Summers, 1945, 325 U.S. 561, 572–573, 65 S.Ct. 1307, 89 L.Ed. 1795.)

■ And this Court, in Richter v. United States, 1950, 9 Cir., 181 F.2d 591, 593, has summed up the principle in one sentence:

"There is no constitutional right to exemption from military service because of conscientious objection or religious calling."

To the same effect are: Rase v. United States, 1942, 6 Cir., 129 F.2d 204, 209–210; Berman v. United States, 1946, 9 Cir., 156 F.2d 377, 381–385; Gara v. United States, 1949, 6 Cir., 178 F.2d 38, 41; Cannon v. United States, 1950, 9 Cir., 181 F.2d 354, 355–356. This being so, there is brought into play the familiar principle that whatever the Government, State or Federal, may take away altogether, it may grant only on certain conditions. Otherwise put, whatever the Government may forbid altogether, it may condition even unreasonably. Outstanding in this domain are the cases dealing with intoxicating liquors. Because the Government may altogether prohibit production or sale, regulations of the most arbitrary kind will be sustained. See, Mugler v. State of Kansas, 1887, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; Eberle v. People of State of Michigan, 1914, 232 U.S. 700, 34 S.Ct. 464, 58 L.Ed. 803; Premier-Pabst Sales Co. v. State Board of Equalization, D.C.Cal.1935, 13 F.Supp. 90 —a decision by a three-judge court in which the writer of this opinion and Judges Mathews and Stephens of this court participated.

Many instances of the application of this principle arise from the exercise of the plenary power of the Congress to regulate foreign and interstate commerce. United States Constitution, Article I, Sec. 8, Cl. 3. And, over the course of years, the courts have held that the exercise of these powers may take the form of absolute prohibition and of the most strict regulation. Buttfield v. Stranahan, 1904, 192 U.S. 470, 492–493, 24 S.Ct. 349, 48 L.Ed. 525; Hipolite Egg Company v. United States, 1911, 220 U.S. 45, 57–58, 31 S.Ct. 364, 55 L.Ed. 364; Caminetti v. United States, 1917, 242 U.S. 470, 491–492, 37 S.Ct. 192, 61 L.Ed. 442; United States v. Hill, 1919, 248 U.S. 420, 427, 39 S.Ct. 143, 63 L.Ed. 337; Brooks v. United States, 1925, 267 U.S. 432, 436–437, 45 S.Ct. 345, 69 L.Ed. 699; Whitfield v. Ohio, 1936, 297 U.S. 431, 439–440, 56 S.Ct. 532, 80 L.Ed. 778; Kentucky Whip & Collar Co. v. Illinois Central Railroad Co., 1937, 299 U.S. 334, 346–348, 57 S.Ct. 277, 81 L.Ed. 270; United States v. Darby, 1941, 312 U.S. 100, 113–116, 61 S.Ct. 451, 85 L.Ed. 609; Carolene Products Co. v. United States, 1944, 323 U.S. 18, 27–32, 65 S.Ct. 1, 89 L.Ed. 15; American Power & Light Co. v. Securities & Exchange Commission, 1946, 329 U.S. 90, 99–100, 67 S.Ct. 133, 91 L.Ed. 103; North American Company v. Securities & Exchange Commission, 1946, 327 U.S. 686, 704–706, 66 S.Ct. 785, 90 L.Ed. 945. And see, Kovacs v. Cooper, 1949, 336 U.S. 77, 87, 69 S.Ct. 448, 93 L.Ed. 513.

The latest illustration of this familiar norm of constitutional law is the Federal Tort Claims Act. 28 U.S.C.A. §§ 1346(b), 1402(b), 2674. As this involves a waiver of sovereign immunity, the Congress could constitutionally provide that no jury should be had, 28 U.S.C.A. § 2402, despite the provisions for jury trial in the Seventh Amendment to the Constitution.

■ In sum, as the exemption from participation in war on the ground of religious training and belief can be granted or withheld by the Congress, the Congress is free to determine the persons to whom it will grant it, and may deny it to persons whose opinions the Congress does not class as "religious" in the ordinary acceptance of the word. So, assuming that the definition of "religious training and belief" in Section 456(j) *is* restrictive, such restriction is within the constitutional power of the Congress.

## II

### The Definition of "Religious Training and Belief".

If we consider the definition of "religious training and belief" contained in Section 456(j) in the light of prior declarations of the Supreme Court on the subject and the religious experience of the United States, it is evident that it does not have a restricted meaning. There is dispute among students as to what Religion is.

Among the dictionary definitions of the word are these:

"(1) The service and adoration of God or a god as expressed in forms of worship, in obedience to divine commands, especially as found in accepted sacred writings or as declared by rec-

451

ognized teachers and in the pursuit of a way of life regarded as incumbent on true believers; as, ministers of religion.

(6) An apprehension, awareness, or conviction of the existence of a Supreme Being, or more widely, or supernatural powers or influences controlling one's own, humanity's, or nature's destiny; also, such an apprehension, etc., accompanied by or arousing reverence, love, gratitude, the will to obey and serve, and the like; religious experience or insight; often, specif., the awakening of religious belief, convictions, etc., as in conversion; as, one without religion; man only is capable of religion; to get religion." (Webster's International Dictionary, 2nd Ed., 1937, 1 and 6.)

There is dispute even as to the etymology of the word. The tendency now is to accept the derivation from the Latin verb *religare* — to bind together. This etymology is attributed to Lactantius, a teacher of Latin Rhetoric of the Fourth Century, who was called "the Christian Cicero". He interpreted religion as essentially "a bond of piety". (Religion, 13 Ency. of the Social Sciences, 1937, p. 228)

William James defined it as:
"the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." (William James, The Varieties of Religious Experience, 1909, page 31)

Mr. Chief Justice Hughes has given this definition:
"The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation. As was stated by Mr. Justice Field, in Davis v. Beason, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637: 'The term "religion" has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.'" United States v. Macintosh, 1931, 283

U.S. 605, 634–635, 51 S.Ct. 570, 578, 75 L.Ed. 1302.

In the case from which Mr. Chief Justice Hughes quoted, Mr. Justice Field relates his definition to the guaranty of the First Amendment in this manner:

"The first amendment to the constitution, in declaring that congress shall make no law respecting the establishment of religion or forbidding the free exercise thereof, was intended to allow every one under the jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose as may be approved by his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect." Davis v. Beason, 1890, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637.

Later decisions have emphasized the scope of the First Amendment as forbidding (a) compulsion of acceptance of any creed, and (b) guarantee of free exercise of any chosen form of religion. United States v. Ballard, 1944, 322 U.S. 78, 86–87, 64 S.Ct. 882, 88 L.Ed. 1148.

■ So it is evident that the definition which the Congress introduced into the 1948 Amendment comports with the spirit in which "Religion" is understood generally, and the manner in which it has been defined by the courts. It is couched in terms of the relationship of the individual to a Supreme Being, and comports with the standard or accepted understanding of the meaning of "Religion" in American society. It covers the case of most persons who derive inspiration from what has been called "the Life of God in the Soul of Man". This accords with what modern religious philosophers call *"la religion dynamique"* (dynamic religion). (See, Henri Bergson, Les Deux Sources de la Morale et de la Religion, 1932, pp. 223 et seq.; Reinhold Niehbuhr, The Nature and Destiny of Man, 1943, Vol. II, pp. 26, 75–76.)

452

So catholic a definition cannot be considered restrictive because it may not be broad enough to include, and actually excludes certain political, sociological, moral or philosophical theories unrelated to religion.

■ Political, sociological, philosophical, and ethical grounds for opposing war are so distinct from opposition induced by religious training and belief that, aside from the considerations just adverted to, the Congress could very well recognize the latter as a ground for exemption and refuse sanction to the former. Even if we were not dealing with the plenary power to provide for the defense of the country, such classification would meet all the accepted tests of due process.

■ Courts do not look for perfect equality in legislative classifications. They will not condemn a classification so long as a reasonable ground exists for inclusion or exclusion. Patsone v. Commonwealth of Pennsylvania, 1914, 232 U.S. 138, 144, 34 S.Ct. 281, 58 L.Ed. 539; People of the State of New York ex rel. Bryant v. Zimmerman, 1928, 278 U.S. 63, 73–77, 49 S.Ct. 61, 73 L.Ed. 184; Bain Peanut Co. v. Pinson, 1931, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482; Skinner v. State of Oklahoma, 1942, 316 U.S. 535, 540, 62 S.Ct. 1110, 86 L.Ed. 1655; Railway Express Agency, Inc., v. New York, 1949, 336 U.S. 106, 112–117, 69 S.Ct. 463, 93 L.Ed. 533.

The appellant, having stated that he believes in a Supreme Being, has brought himself clearly within the statutory definition. And *he is not* in a position to question the validity of the section upon the ground that others differently situated are not included.

■ There is brought into play the familiar constitutional principle that one whose rights are not affected by a statute as *it applies to him* is not in a position to question its validity *as applied to others.* Tyler v. Judges of the Court of Registration,

1900, 179 U.S. 405, 21 S.Ct. 206, 45 L.Ed. 252; Hendrick v. State of Maryland, 1916, 235 U.S. 610, 621–622, 35 S.Ct. 140, 59 L.Ed. 385; Fairchild v. Hughes, 1922, 258 U.S., 126, 42 S.Ct. 274, 11 L.Ed. 499; Commonwealth of Massachusetts v. Mellon, 1923, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078; Voeller v. Neilston Warehouse Co., 1941, 311 U.S. 531, 537, 61 S.Ct. 376, 85 L.Ed. 322. There is continuity in the cases on this subject. Of great significance among the latest cases is Fay v. People of State of New York, 1947, 332 U.S. 261, 287, 67 S.Ct. 1613, 1627, 91 L.Ed. 2043, where it is stated that the court

"has never entertained a defendant's objections to exclusions from the jury *except when he was a member of the excluded class.* Rawlins v. State of Georgia, 201 U.S. 638, 640, 26 S.Ct. 560, 50 L.Ed. 899. Cf. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664. *Relief has been held unavailable to a negro who objected that all white persons were purposely excluded from the grand jury that indicted him.*"[1] (Emphasis added.)

■ As the appellant is not harmed by the definition of "religious training and belief" contained in Section 456(j), or the express exclusion of non-religious pacifists because he is not "a member of the excluded class", he is not in position to question the validity of the enactment, merely because others differently situated *might be* affected unconstitutionally by it. In effect, he is in the same situation as the Negro in the case referred to by the Supreme Court in Fay v. New York, supra, who objected to the exclusion of white persons from the grand jury.

### III

### The Exclusion of Minors from Grand Jury.

The appellant makes a novel contention based on the fact that the indictment against

---

1. There is nothing in Hague v. Committee for Industrial Organization, 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, contrary to the principles declared in these cases. All the opinions invalidating the New Jersey ordinance state that it forbade free speech to everyone, includ-

ing the respondents. See, opinion of Mr. Justice Roberts, 307 U.S. at pages 501, 505, 506, 507, 508, 59 S.Ct. at pages 957, 959, 960; opinion of Mr. Justice Stone, 83 U.S. at pages 521–524, 59 S.Ct. at pages 967, 968.

him was returned by a grand jury which excluded minors. 28 U.S.C.A. § 1861. He argues that the decision of the Supreme Court in Ballard v. United States, 1946, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181, forbids such exclusion. We believe that the appellant has misread that decision and its meaning.

The decision was based upon the conclusion that the system of selection of jurors which the Congress has adopted contemplated that juries in federal courts sitting in States where women are eligible for jury service under local law will be representative of both sexes. And because, in California, women are eligible for jury service, California Code of Civil Procedure, § 198, the Court held that such systematic exclusion was a thwarting of the congressional intent. Nowhere in the opinion of the majority is it intimated that such act is a denial of due process. To have so held would have gone counter to previous declarations of the court. Strauder v. West Virginia, 1879, 100 U.S. 303, 310, 25 L.Ed. 664.[2]

On the contrary, the final conclusion to invalidate the jury selection referred to the exercise by the court of the "power of supervision over the administration of justice in the federal courts". Ballard v. United States, supra, 329 U.S. at page 193, 67 S.Ct. at page 264. A later case reaffirms this interpretation, Fay v. New York, 1947, 332 U.S. 261, 287, 67 S.Ct. 1613, 91 L.Ed. 2043.

 But, under the law of California, minors are excluded from jury and grand jury service. California Code of Civil Procedure, Sec. 198(1). And, as the Judicial Code also contains such exclusion. 28 U.S.C.A., § 1861, there is no conflict between the policy of the Congress and the policy of the State. Minority as a dis-

qualification for participation in certain types of employment and the performance of certain public or social functions is recognized in the law of the United States. 43 C.J.S., Infants, §§ 11, 13, 24; Prince v. Commonwealth of Massachusetts, 1944, 321 U.S. 158, 167–170, 64 S.Ct. 438, 88 L.Ed. 645. Constitutionally the Congress may, as may the State legislatures, deny certain privileges to minors which it grants to others. 43 C.J.S., Infants, § 19; 27 Am.Jur., Infants, Secs. 102–103; Hampton v. Ewart, 1927, 8 Cir., 22 F.2d 81, 86–87. And minority as a special classification has always had judicial sanction. 43 C.J.S., Infants, § 11; Jones v. Prairie Oil & Gas Company, 1927, 273 U.S. 195, 198, 47 S.Ct. 338, 71 L.Ed. 602; Prince v. Commonwealth of Massachusetts, 1944, 321 U.S. 158, 167–170, 64 S.Ct. 438, 88 L.Ed. 645; People v. Camp, 1919, 42 Cal.App. 411, 417, 183 P. 845; Buelke v. Levenstadt, 1923, 190 Cal. 684, 688, 214 P. 42; People v. Curtiss, 1931, 116 Cal.App.Supp. 771, 781, 300 P. 801.

 It is argued that, because minors are subjected to the Selective Service Act, they cannot be prosecuted unless minors are on the grand jury which indicts them. The argument is untenable. Until the rise of juvenile delinquency and juvenile courts, minors everywhere were subjected to the penalties of all criminal statutes, even those relating to murder, although excluded from participation in the grand juries which indicted them, and the juries which tried them for the violation of law. 43 C.J.S., Infants, § 96(g); 28 Am.Jur., Infants, Sec. 100.

Juvenile statutes allowing special treatment of offenders are a modern innovation. The first law creating a juvenile court was enacted by the Legislature of Illinois and went into effect on April 14, 1899. (Thorsten Sellin, in Foreword to "Juvenile De-

---

2. "We do not say that within the limits from which it is not excluded by the amendment a State may not prescribe the qualifications of its jurors, and in so doing make discriminations. It may confine the *selection to males*, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications. We do not believe the Fourteenth Amendment was ever intended to

prohibit this." Strauder v. West Virginia, supra, 100 U.S. at page 310, 25 L. Ed. 664. This case has been cited with approval very recently in Fay v. New York, 1947, 332 U.S. 261, 287, 67 S.Ct. 1613, 91 L.Ed. 2043, and Brunson v. State of North Carolina, 1948, 333 U.S. 851, 68 S.Ct. 634, 92 L.Ed. 1132. (Emphasis added)

linquency", The Annals of the American Academy of Political and Social Science, No. 261, January 1949, pp. VII and VIII; Paul W. Tappan, Juvenile Delinquency, 1949, Chapter 8, pp. 167–194.) They were introduced into federal criminal jurisprudence by the Act of January 16, 1938, 52 Stat. 764, Chapter 486.

As the statute and the rules for the selection of grand jurors make no provision for grand juries of different composition, 28 U.S.C.A., §§ 1864, 1867, Rule 6, Federal Rules of Criminal Procedure, how, from a practical standpoint, could the situation be met? Concededly, minors would have no place on grand juries which deal with offenses against adults. For, as to adults, minors would represent not a part of the cross section of the country, but a wholly *foreign* group unrelated to the adult stream which dominates American life. Having chosen such grand jury, is another one to be chosen to include minors whenever the United States Attorney informs the Court that he intends to prosecute a minor under the Selective Service Act? These are practical problems. They indicate the impossibility of carrying into effect such a program. It is certain that the Supreme Court in its supervisory capacity would not force upon the federal trial judges of the land a program fraught with such possibilities. The fact that a minor is subject to this law has no more meaning than the fact that, under state law, a young woman under twenty-one, who may marry after she attains the age of eighteen, California Civil Code, § 56, may be guilty of bigamy, California Penal Code, § 281, and be tried on an indictment returned by a grand jury from which women of her age are excluded, by a jury from which women in her class are also excluded.

We do not believe that the compulsion to bear arms can automatically force the lowering of the age limit for other purposes, such as grand jury and jury service, under any theory of due process. The cases which forbid racial and other discrimination in the selection of jurors and grand jurors do not call for a different conclusion. Pierre v. State of Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Akins v. State of Texas, 1945, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Patton v. State of Mississippi, 1947, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76; Cassell v. Texas, 1950, 339 U.S. 282, 283, 70 S.Ct. 629, 94 L.Ed. 839.

Equally untenable is the proposition that, because both under California and Federal law, California Constitution, Article II, Sec. 1; United States Constitution, Article I, Sec. 2; Article II, Sec. 1, Cl. 2, and the 17th Amendment, the defendant is not allowed to participate in the election of the representatives who passed the Selective Service Act of 1948, he may not be prosecuted for a violation of this law. Concededly, the provisions of the Constitution requiring that the elections of members of the Congress shall be governed by state law stand in the way of the validity of this argument. United States Constitution, Article I, Secs. 2 and 4; Article II, Sec. 1, Cl. 2, and the 17th Amendment. For there is no way under the law, as it now stands, of compelling California to amend its Constitution so as to lower the age of voting in national elections to correspond to the lower induction age under the Selective Service Act of 1948.

Are the needs of national defense to be stayed? Are young men under age, who, under the power of the Congress to provide for national defense and to carry on war, may be drafted into the Army, and who, admittedly, make excellent soldiers, to be denied their services to the nation in time of crisis until the various State Legislatures or the peoples of the States amend their laws or constitutions so as to make the voting age correspond to the draft age? For this would be necessary under the provisions of the Constitution of the United States just cited, which make the qualifications dependent upon those "requisite for Electors of the most numerous Branch of the State Legislature." United States Constitution, Article I, Secs. 2 and 4, Article II, Sec. 1, Cl. 2 and the 17th Amendment. The unreality of such argument is self-defeating.

In his concurring opinion in Hamilton v. Regents of University of California, 1934, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343. Mr. Justice Cardozo summed up the right

of the coercive power of the State to form armies in two very pithy phrases:

"The conscientious objector, if his liberties were to be thus extended, might refuse to contribute taxes in furtherance of a war, whether for attack or for defense, or in furtherance of any other end condemned by his conscience as irreligious or immoral. *The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government.*" Hamilton v. Regents, supra, 293 U.S. at page 268, 55 S.Ct. at page 206. (Emphasis added.)[3]

The appellant's contention not only overlooks this fundamental principle, but would require the recasting of the entire constitutional structure of states and nation before the right could be exercised as to persons under the age of 21.

Under the guise of an illusory equality between the minor who is compelled to serve in the army and the adult, it would undermine the constitutional balance between federal and state governments,—so important in our governmental structure.

In the light of what has just been said, we find no constitutional infirmity, either in the definition of "religious training and belief" in Section 456(j), 50 U.S.C.A.Appendix, or deprivation of the due process in the exclusion of minors from the grand jury which indicted the appellant for the violation of which he stands convicted.

The judgment is, therefore, affirmed.

---

3. When during the war between the States, the First Conscription Act was passed, it was attacked from various sources by men in public life and in the lower courts. No case ever reached the Supreme Court. However, the best argument in favor of its constitutionality was written by President Lincoln himself in a paper which was not published until years afterwards. Two recent writers have characterized the paper as containing "legal logic that was reminiscent of John Marshall at his best." (Alfred H. Kelly and Winfred H. Harbison, The American Constitution, 1948, p. 422) Lincoln wrote:

"It is the first instance, I believe, in which the power of Congress to do a thing has ever been questioned in a case when the power is given by the Constitution in express terms. * * *

The case simply is, the Constitution provides that the Congress shall have power to raise and support armies; and by this act the Congress has exercised the power to raise and support armies. This is the whole of it. It is a law made in literal pursuance of this part of the United States Constitution. * * * The Constitution gives Congress the power, but it does not prescribe the mode, or expressly declare who shall prescribe it. In such case Congress could and must follow that mode; but, as it is, the mode necessarily goes to Congress, with the power expressly given. *The power is given fully, completely, unconditionally. It is not a power to raise armies if State authorities consent; nor if the men to compose the armies are entirely willing;* but it is a power to raise and support armies given to Congress by the Constitution without an if." (op cit. loc. cit. p. 422) (Emphasis added)