**Arthur Parisette CLARK, Appellant,**
v.
**UNITED STATES of America,**
Appellee.
No. 14634.

United States Court of Appeals
Ninth Circuit.

June 20, 1956.

Rehearing Denied July 23, 1956.

Certiorari Denied Oct. 22, 1956.

See 77 S.Ct. 101.

J. B. Tietz, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Louis Lee Abbott, Cecil Hicks, Jr., Los Angeles, Cal., for appellee.

Before STEPHENS, FEE, and CHAMBERS, Circuit Judges.

STEPHENS, Circuit Judge.

Appellant Arthur Parisette Clark, a Service selectee, was charged with and was found guilty of and was sentenced for wilfully refusing to be inducted into the Armed Forces of the United States, in violation of the Universal Military Training and Service Act, Title 50 U.S. C.A.Appendix, §§ 451[1] et seq., 462(a).[2] He appealed.

We review the long chronology of events that led up to appellant's conviction.

1. June 24, 1948, c. 625, Title I, 62 Stat. 604.

2. June 24, 1948, c. 625, Title I, § 12, 62 Stat. 622.

3. Following are the pertinent parts of Selective Service System "Special Form for Conscientious Objector", SSS Form 150, filled in and signed by appellant-selectee:

## The Facts

Appellant registered with the Selective Service System on October 6, 1948, and at that time filled in Series XIV, page 7, of the Classification Questionnaire which indicated he was a conscientious objector. The Special Form, SSS 150, for Conscientious Objector was not filed. Whether he obtained one, we do not know. On October 12, 1948, the appellant-selectee was classified I–A by the Local Board and no appeal was taken.

On June 8, 1950, appellant was handed a Form 150 by the Local Board, but it was not returned. On October 3, 1950, he was found physically acceptable for service. October 4, 1950, the Board received from Chapman College a letter stating that appellant was "regularly in attendance upon classes." On October 28, 1950, he was ordered to report for induction on November 8, 1950. He did not report for induction. However, on November 14, 1950, the Board postponed induction until June, 1951, because of his student status.

On June 27, 1951, appellant received from his board another SSS Form 150, which he returned completed the next day. The questionnaire contained the question:

"Do you believe in a Supreme Being?"

with the word "Yes" with a place for checking, and the word "No" and a place for checking. Appellant checked the word "No" and added,

"I do not know whether or not a Supreme Being exists."

It therefore appears that appellant's claimed religion is not based upon the existence of a Supreme Being.[3]

"Series I.—Claim for Exemption.
"(A) * * *
"(B) I am, by reason of my religious training and belief, conscientiously opposed to participation in war in any form and I am further conscientiously opposed to participation in noncombatant training or service in the armed forces. I, therefore, claim exemption from combatant

On August 7, 1951, appellant appeared for interview before the Local Board regarding his conscientious objector claim and the Board continued him in Class I-A, and the day after sent him notice thereof. By letter received August 20, 1951 (dated August 18) appellant notified the Board that he wished to appeal his classification. Also, on August 20, 1951, the Board received from his school a College Student Certificate (SSS Form 109) showing that he was not in college attendance after June 9, 1951, and that he was in the lowest one-fourth of his class. On September 12, 1951, appellant visited the Board and examined his file and copied portions thereof at which time he mentioned that he had an attorney. On October 9, 1951, he was again classified I-A (apparently the Board did this because of the receipt of Form 109, although it did not have to) and appellant was so notified on SSS Form 110. Appellant inspected his file on October 12, and a week later informed the Board he was appealing his classification. Since he had been classified I-A on August 7, and had appealed his status, his file had

training and service and, if my claim is sustained, I understand that I will, because of my conscientious objection to noncombatant service in the armed forces, be deferred as provided in Section 6(j) of the Selective Service Act of 1948.

[signed] Arthur P. Clark
(Signature of registrant)

"Series II—Religious Training and Beliefs.

"1. Do you believe in a Supreme Being? Yes [ ] No [X] 'I do not know whether or not a supreme being exists.'

"2. Describe the nature of your belief which is the basis of your claim made in Series I above, and state whether or not your belief in a supreme being involves duties which to you are superior to those arising from any human relation.

'I believe that the individual is of supreme worth—of more value than all the material goods, cultural accumulations, or states and governments. I do not believe that any individual has the moral right to take the life of another human being. I believe that all persons participating in the work of the armed forces are in part responsible for the destruction of human life which the armed forces is accomplishing.'

"3. Explain how, when and from whom or from what source you received the training and acquired the belief which is the basis of your claim made in Series I above.

'My present beliefs are the result of a gradual development of my thinking over a long period of time —of my study and observations and experience with human relations. I feel that the most important source of my ideas is the teachings of Jesus of Nazareth which deal with how we should feel and behave toward our fellow men, as they are related and interpreted in the New Testament.'

"4. Give the name and present address of the individual upon whom you rely most for religious guidance.

'I do not rely particularly on any individual for religious guidance.'

"5. Under what circumstances, if any, do you believe in the use of force?

'I believe in the use of force by society to restrain an individual whose activities would jeopardize the wellbeing of others—that such a person should be recognized as being ill—that society should take steps to keep him in such a way that he cannot harm others (permitting him to live the best life possible while being so restricted)— that treatment should be given to rehabilitate him and to permit his freedom to be safely restored if rehabilitation is possible.'

"6. Describe the actions and behavior in your life which in your opinion most conspicuously demonstrate the consistency and depth of your religious convictions.

'I have made an effort to live peaceably with my fellow men, in a spirit of understanding, appreciation, love and kindness and I have encouraged others to do likewise.'

"7. Have you ever given public expression, written or oral, to the views herein expressed as the basis for your claim made in Series I above? If so, specify when and where.

'No, I have expressed my views to individuals, but not to groupes [sic.].' "

been forwarded to the Appeal Board on October 16, and in turn forwarded to the Department of Justice for investigation and hearing. The Hearing Officer and the Department of Justice recommended that he be classified I-A. On June 23, 1952, appellant was classified I-A by the Appeal Board.

On July 23, 1952, he was ordered to report for induction on August 7, 1952, as a postponed registrant. A letter was received August 1, 1952, by the Board from appellant's attorney, Mr. Tietz, requesting postponement of induction. One week later, the appellant refused induction. He was reported as a delinquent and his file was forwarded to the United States Attorney. It turned out a procedural error caused the Board to take his name off the delinquent list and to reorder him for induction on September 15, 1952. Again, appellant inspected his file on the 4th day of September, 1952, and on September 15 he refused to be inducted.

Appellant was thereafter indicted for his refusal to be inducted, but the government dismissed its case when the court ordered F.B.I. reports admitted into evidence so that an *in camera* inspection could be made.[4] The Local Board, on May 26, 1953, received authority to reopen appellant's file and after the reopening, on June 16, 1953, appellant was again classified I-A. Thereafter, appellant was accorded a personal appearance, and we set out a summary of occurrences in the margin.[5] Appellant

---

4. Not a valid practice under the decisions in White v. United States, 9 Cir., 215 F. 2d 782, and Campbell v. United States, 4 Cir., 1955, 221 F.2d 454. See, also, Kaline v. United States, 9 Cir., 235 F.2d 54.

5. Personal Appearance, July 7, 1953.
 The registrant was sworn in.
 The registrant was asked if his beliefs had changed since his interview with the Board on August 7, 1951. He replied that he still held the same point of view, and that he still did not believe in a Supreme Being.
 The Chairman of the Board then read the minutes of the above mentioned interview which was discussed intermittently as follows:
 "Registrant was asked what he wished to discuss. He replied that he wished to become a Conscientious Objector, that he thought that war was not a good thing, that human life was most important, and that war was destroying it.
 "Registrant was asked where he attended church, to which he replied that he did not attend any particular church."
 Here the registrant said that he became a member of the Unitarian Church on Easter Sunday, March, 1952, and is presently a member of that church.
 "Registrant was asked if he had ever read what was required of one who intended to become a citizen of the United States, and if he just accepted his citizenship. Registrant replied, 'Well, no—'".
 At this point the Board asked if he still

did not know the requirements of becoming a citizen and why he had answered "No" to the question. He said he did not understand just what the Board meant when asked before, but that he thought he knew what was required of a citizen.
 "Board then stated that it was not the intention of the board to change the registrant's mind, that he would be given every right, but that they wished to make him *think*. He apparently was 'not working at being a conscientious objector' inasmuch as he was not associated with any church. His attention was called to the fact that it was necessary to kill to maintain human life; that is, animals for meat, etc., that self-preservation, too, was the first law of nature."
 Reference was again made to the fact that he had since become a member of the Unitarian Church.
 The reading of the minutes of the interview continued:
 "The registrant stated that he felt that this" (self-preservation) "was true of animals, but not true of human beings.
 "Registrant was asked when he first decided to become a Conscientious Objector. The registrant replied that in the past six months he had come to the conclusion that he could not take part in taking another person's life.
 "Registrant was asked if he thought anyone liked the prospect of taking the life of another, even when it seemed necessary to the preservation of our life.
 "Registrant explained that he felt that human beings had reasoning pow-

er, and should solve their problems without fighting.

"Registrant was told that, inasmuch as he had stated that he did not believe in a Supreme Being, he appeared confused, that he had been a wanderer from one church to another.

(The Chairman Read From the Registrant's Form 150)

"Registrant then offered the statement that he was now connected with the Christian Church of Pasadena."

Here the registrant interrupted to bring out the fact that he was not a member of the Pasadena church, but that he did participate in activities connected with the church.

"Registrant was questioned concerning his parents. He said that his mother and father were divorced, that he was living with his mother.

"The chairman of the board, Mr. Scott, said, 'I mean this kindly—You are apparently on a merry-go-round in so far as your thinking is concerned. Do you ever talk to the pastor?'"

Here the Board asked the registrant if he had ever discussed being a Conscientious Objector with anyone. The registrant said he had talked it over with Glen Smiley, who is leader of an anti-war organization called the Fellowship of Reconciliation.

"Registrant was then asked what he really was trying to bring out concerning the world situation.

"Registrant then replied that he felt that war was not the way, that we ought to be friendly to the Russians. The registrant stated that he would like to see disarmament.

"It was pointed out to the registrant that Kellogg brought about disarmament, and as a result we were in a mess today. It was suggested that the registrant read both sides of history.

"It was also brought out that policemen served somewhat the same purpose as an army at this time, that we paid taxes to pay the salaries of policemen, that they were there in case a need arose."

When questioned again regarding his belief on these points the registrant said he does believe that we should maintain a police force. He also stated that he thinks we are in part to blame for world conditions today.

Regarding his education, the registrant said that he resumed his studies at Chapman College about two weeks ago, and that he has less than one year to finish at Chapman. He plans to teach school, he said, beginning with the elementary grades, then High School.

During the year previous to returning to school he had been working for the telephone company as a motorized messenger, the registrant added. He earned $49. a week there, he said, and was able to save a part of his earnings for his school expenses.

The Chairman of the Board then continued reading the minutes of the interview:

"Registrant was further questioned concerning the apparent inconsistency of his Conscientious Objector's claim; that is, that he upheld the teachings of Jesus, but did not believe in a Supreme Being.

"Registrant stated that he did not accept all that Jesus taught, that he accepted the Christian philosophy only in so far as it applied to the relationship of one individual to another."

Each time when asked, the registrant insisted that his beliefs were still the same as brought out in the interview.

"Registrant was informed that in the ten years of service of the board members, he, the registrant, appeared to be one of the most confused registrants they had ever met.

"Registrant's reply was that he did not feel confused.

"It was again brought out that registrant had gone from one religious belief to another, and had finally come to the conclusion that he did not believe in a Supreme Being, but was still associated with a church.

"Registrant was asked if he accepted a salary in his church activity. He said that he did not, and then went on to explain that he believed in nature, and in a natural process, that he could not see a mind guiding our affairs.

"Registrant was informed that a Conscientious Objector who was sincere in his beliefs could go into the service as a non-combatant, that he could be of some use in caring for the injured, as a Chaplain's assistant, etc.

"Registrant asked for a further explanation of the world 'noncombatant.' It was explained that it meant participation in some way where the bearing of arms was not necessary.

"The registrant replied that his position was such that he would not contribute to war in any way.

"The board pointed out that anyone who was gainfully employed possibly contributed to war in some way; that is, the production of food or the production of anything might contribute indirectly, or at least might be indirectly connected with it. One had to pay taxes, also, which was a contribution to defense.

offered no additional evidence on his conscientious objector claim and was advised that he would be continued in Class I-A and was notified officially thereof on July 8, 1953. On July 20, 1953, a letter was received from appellant appealing that classification.[6] Appellant's file was then forwarded to the Appeal Board and it was referred to the United States Attorney's office for investigation, hearing, and recommendation by the Department of Justice. The United States Attorney sent the file back to the Appeal Board with the following notation:

"It appears from the registrant's file that he does not believe in a Supreme Being. In order for a registrant to qualify for a conscientious objector exemption, he must be opposed to war in any form *by reason of his religious training and belief*. Religious training and belief is defined by the statute as a belief in a Supreme Being involving duties superior to those arising from any human relation. Thus, the registrant does not have a claim within the meaning of the statute granting the exemption. By reason of the foregoing, the Department of Justice has no jurisdiction to conduct the inquiry and hearing in this case."

On December 15, 1953, the Appeal Board classified appellant I-A. Appellant was mailed SSS Form 252, Order to Report for Induction, ordering him to report for induction on January 8, 1954. On the date specified appellant reported to the induction station but refused to be inducted, and there signed a written, dated, and witnessed statement to that effect. Prosecution followed.

### The Appeal

First, appellant argues that he was denied due process of law because the Board failed to post the names and addresses of Advisors to Registrants as required by the regulation § 1604.41 of Title 32 C.F.R. (1951 Ed.). Mere failure to appoint advisors or the failure to post the names and addresses of advisors is not *per se* a violation of due process; and that lack of due process exists as to such failure only when substantial

---

"Registrant was then asked what he honestly felt he could contribute to the world. He said that he expected to do what he could to reconcile the countries of the world.

"Registrant was questioned as to how he subsisted. He said that his mother worked, that he lived with her and did odd jobs, that he had an insurance policy from his grandmother." To the last statement the registrant added that the money from the insurance policy had been spent.

"Board informed registrant that he had not convinced them that he was truly a conscientious objector, that they could see nothing but a continuation of I-A, and then informed him of his appeal right.

"Registrant said that he did not know what else he could say to influence them (the board)."

This concluded the reading of the minutes of the interview of August 7, 1951, and reference was again made to the beliefs of the Unitarian Church.

The board questioned the registrant as to whether or not Unitarians believe in a Supreme Being, to which he replied that some of them do and some do not believe that there is a Supreme Being. He added that Unitarianism is Humanitarian, and their main interest is in the welfare of human beings.

The registrant was also asked if it was true that the Unitarian Church has had a great number of meetings which were anti-American, pro-Russian, and that Paul Robeson sang there. Registrant replied that he does not approve of Paul Robeson, of some of the things he has done.

The Board advised registrant that he could submit any additional information for his file. Also that he would be continued I-A by the Board, and was reminded of his right of appeal.

The registrant then left, and the Board members reviewed the testimony and the complete file. [From Report dated July 7, 1953, Selective Service System, Local Board No. 99, 5507 Santa Monica Blvd., Los Angeles 38, California]

6. We note that under regulation § 1626.2 (c) (1), in Title 32 C.F.R., appeals must be made within 10 days of the mailing of the notice of classification. No point is made of this untimely appeal.

prejudice is shown. Uffelman v. United States, 9 Cir., 1956, 230 F.2d 297, and Kaline v. United States, 9 Cir., 235 F.2d 54. Appellant at the trial testified that he contacted the local board and asked the name of an appeal officer from whom he could get advice. He was given the name of an appeal officer and he contacted him. Further, appellant on many occasions inspected his file and copied portions thereof. He told the board that he had an attorney and his attorney contacted the Board. A Selective Service official testified at the trial that although no one was labeled with the title "Advisor to Registrants", there were others in the Board's office who performed the same function. No prejudice is shown.

Next, appellant argues that there was failure of proof that he [appellant] had refused to submit to induction, after being warned of the penalty. This issue was not raised at the trial, and is not included in appellant's Points on Appeal, as required by the rules of this court.[7] However, the record shows the following writing:

"January 8, 1954
"I refuse to be inducted into the Armed Forces of the United States."
/s/ "Arthur P. Clark
"Witnessed by:
/s/ "Earl S. Beydler, Capt. Inf.
/s/ "George J. Newton Jr., M/Sgt., U.S.Army."

■ Appellant argues that Chernekoff v. United States, 9 Cir., 1955, 219 F.2d 721, is exactly the same case as the instant one. The two cases differ. The point as to failure of proof of refusal to be inducted, was raised in Chernekoff. The Chernekoff statement was not *dated*. There is not a scintilla of evidence in the record in our instant case that appellant was denied an opportunity to take the "step forward". In Chernekoff, this was not true. As we recently said in Kaline

v. United States, 9 Cir., 235 F.2d 54, in a like situation:

"* * * The presumption is that the legal steps were taken and if appellant wanted to overcome this presumption, he should have made the point at the trial."

Appellant further argues that he was entitled to an investigation and hearing by the Department of Justice on his *second* and last appeal and the failure to grant him such a hearing and investigation rendered his order to report for induction void. We find this argument unsound for several reasons. We reiterate that appellant had a full and complete investigation and hearing by the Department of Justice on his *first* conscientious objector claim made in 1951.[8] The Appeal Board had on June 23, 1952, decided against his claim and classified him I–A. On June 7, 1953, the appellant was given a personal appearance after he had been again classified I–A by the Local Board. At this personal appearance appellant offered no additional evidence on his previous claim to conscientious objector status. Rather, at this appearance he reiterated without change his previously expressed views and he maintained a lack of belief in a Supreme Being. The appeal was untimely (see footnote 6, supra).

■ Appellant here argues that the lapse of time since his first appeal as to his denial of conscientious objector status, is in itself a sufficient ground for requiring a new investigation and hearing. We disagree. Here, the original investigation and hearing may not have been required under the regulations. Nothing new was developed at his interview, and his beliefs were exactly the same. We do not hold that a change of belief may not come about in the passage of time, but the mere passage of time is not significant.

7. See Rule 17(6), Rules of the United States Court of Appeals for the Ninth Circuit.

8. We note that appellant may not have even been entitled to this first investigation and hearing, due to the fact that his SSS Form 150, on its face, clearly showed that he was not a conscientious objector within the statutory definition because of his lack of belief in a Supreme Being.

Appellant argues that "all" claims to conscientious objector status require investigation and hearing. We disagree. The statute is clear as to what Congress intended when it created an exemption from service for persons who are honest and sincere conscientious objectors. The statute, Section 6(j) of the Universal Military Training and Service Act of 1948 as amended Title 50, U.S.C.A.Appendix, § 456(j) provides in part:

"Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, *by reason of religious training and belief*, is conscientiously opposed to participation in war in any form. *Religious training and belief in this connection means an individual's belief in a relation to a Supreme Being* involving duties superior to those arising from any human relation, *but does not include essentially political, sociological or philosophical views or a merely personal moral code.* * * * Any person claiming exemption from combatant training and service *because of such conscientious objections* shall, if such claim is not sustained by the local board, be entitled to an appeal to the appropriate appeal board." [Emphasis supplied.]

We note that we are not here dealing with the issue of the sincerity or veracity of appellant's beliefs,[9] but rather with the problem whether any and every claim of conscientious objection requires an investigation and hearing. From the face of appellant's SSS Form 150, it is ascertainable that appellant clearly does not fall within the statutory definition of a conscientious objector. He lacks belief in a Supreme Being; he does not have these beliefs "by reason of religious training and belief." He is agnostic in thought,[10] and holds his views as a "result of a gradual development of [his] thinking over a long period of time—of [his] *study* and observation and experience with human relations." Nowhere does he state whether his "belief in a supreme being involves duties which to [him] are superior to those arising from any human relation." (Series II of SSS Form 150, Question 2. See footnote 3, supra.)

It is thus obvious that appellant is the type of "objector" which the statute was designed to exclude (i.e., those holding views based on political, sociological, or philosophical views or a merely personal code). Appellant does not fall within the statutory definition and the denial of his "claim" is not subject to investigation and hearing by the Department of Justice. Even if it were held that his claim were within the definition, he still was not entitled to a *second* hearing and investigation, due to the fact that he had already had one hearing and had made no claim of change of belief since his first denial of conscientious objector status. A registrant is not entitled to repetitious determinations of identical issues. See Davidson v. United States, 9 Cir., 1955, 218 F.2d 609, and the same case on granting certiorari, 349 U.S. 918, 75 S.Ct. 659, 99 L. Ed. 1251, where the Supreme Court said:

"The petition for writ of certiorari is granted and the judgment of the Court of Appeals is vacated.

9. This fact distinguishes our case from two cases in which it was held error to deny a registrant an investigation and hearing. See: De Moss v. United States, 8 Cir., 1955, 218 F.2d 119, reversed 349 U.S. 918, 75 S.Ct. 659, 99 L.Ed. 1251, and Bates v. United States, 8 Cir., 1954, 216 F.2d 130, reversed 348 U.S. 966, 75 S. Ct. 529, 99 L.Ed. 753. These two cases cited by appellant in his supplemental brief filed at the time of the oral argument before this court, dealt with a denial of an *original investigation and hearing* and in both cases the registrant's "claim" was within the statutory definition, and the issue was the registrant's sincerity in his beliefs. That is not the situation in our instant case.

10. We mean no criticism, but merely point out that the provisions for conscientious objector classification were not met by appellant.

**22**

The cause is remanded to the Court of Appeals *for consideration of whether petitioner's conscientious objector claim comes within the provisions of § 6(j) of the Universal Military Training and Service Act,* in which event this case would be governed by Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409 [99 L.Ed. 467]." [Emphasis supplied.]

After the Supreme Court remanded Davidson to our court, we considered whether the selectee's claim came within the statute, and held, in Davidson v. United States, 9 Cir., 1955, 225 F.2d 836, that it did not. Certiorari was denied 1955, 350 U.S. 887, 76 S.Ct. 142. We find in the instant case no denial of due process because of the denial of the second hearing.

 Next, appellant argues that he was not given a full and fair hearing before the Hearing Officer of the Department of Justice on his *first* claim to conscientious objector status, because the Hearing Officer withheld adverse evidence from him at the hearing. He argues that this "tainted" report of the Hearing Officer as a result of his appearance, is not a true picture because he did not have an opportunity at that time to rebut the withheld information. He then argues that the Appeal Board, when it was considering his *second* claim to conscientious objector status, would take into consideration this "old" Hearing Officer report and recommendation and, because that recommendation was "tainted", he was thereby prejudiced. We note, first, that the appellant did not raise this point at the trial until after he had been convicted. Appellant had taken the stand to testify in his own behalf and made no mention of this supposed "tainted" report or the supposed withholding of adverse evidence. When he did bring the matter up, he merely made a general allegation, "I didn't receive the information that he had against me, as the Dickinson case [Dickinson v.

United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132] says is required." No proof was offered at this time to substantiate the charge. Instead three days later, appellant submitted an affidavit in which he stated his *recollection* of what he had previously testified to when he first had been indicted and trial commenced before another judge. At that trial, the indictment was dismissed by the government when the trial judge ordered the production of the F.B.I. secret investigative reports.[11] There is nothing in the record to enable us to ascertain whether the Hearing Officer did or did not withhold adverse information. We hold against appellant on this point.

 But the controlling point here, though, is the fact that after this assertedly "tainted" report was sent to the Department of Justice and also to the Appeal Board and a decision had been made, the appellant was accorded a second determination by the Appeal Board as to his conscientious objector claim. The purpose of giving the registrant a fair resume of any adverse information is to enable him to rebut it if he can. Simmons v. United States, 348 U.S. 397, 75 S.Ct. 397, 99 L.Ed. 453.

The Hearing Officer's summary and the Department's recommendation (as to his *first* claim) were placed in appellant's file on June 23, 1952. Appellant's file reveals that on June 24, 1952, appellant visited the Local Board and examined his file and copied portions thereof. Also, from appellant's own affidavit as to what occurred at his first trial (March 12, 1953) which was dismissed by the government, as explained above, it is revealed that appellant knew at least by March 12, 1953, of any adverse evidence which he claimed was withheld from him. Subsequently, the Local Board reopened the classification and appellant personally appeared before the Board. No evidence at that time was presented which would in any way rebut this supposed adverse evidence,

11. See footnote 4, supra.

even though at this time the appellant knew of such information. Again, the Appeal Board considered his claim, and he also had an opportunity to answer or reply to the information of which he now complains.

Even if appellant could raise the point here (but we do not hold that he could), he cannot in the circumstances show prejudice. He has been given that which Simmons v. United States, 348 U.S. 397, 75 S.Ct. 397, 99 L.Ed. 453, supra, requires. We further note that no prejudice could be shown because the very "claim" that appellant was asserting was not a "claim" within the statutory definition of a conscientious objector, as discussed above. United States v. De Lime, 3 Cir., 1955, 223 F.2d 96, is analogous. It was there said, at page 100:

"Consequently, the defendant's own uncontradicted statements demonstrate that his claim was not based on 'religious training and belief,' within the meaning of the statute. Therefore, he was not prejudiced by not receiving an adequate or fair resume of the F.B.I. report. The fact that his credibility was attacked in the report was immaterial for if everything he had said in support of his claim for exemption was fully believed his position continued to lie entirely outside of the statute. * * * [T]he defendant in the instant case could not have been prejudiced by the failure to furnish him a fair resume because the denial of conscientious objector status was necessitated by his own statements and was not based on any rebuttable information acquired from other sources as in Simmons. This is not a case, where, despite a lack of prejudice, proceedings must be vitiated if procedural requirements are not met."

Appellant next argues that he did not have an opportunity to answer the adverse recommendation of the Department of Justice. This point, likewise, was not raised at the trial, nor included in appellant's Points on Appeal. We find no merit in the argument even if he were able to raise it here, since he had a second hearing before the Local Board and likewise had a second appeal to the Appeal Board. He at that time knew of the recommendation but did not rebut it. As we have seen above, he also could not be prejudiced here, either, since his "claim" was not within the meaning of the statute. There is nothing in the record to indicate that he did or did not receive a copy of the recommendation.

Lastly, the appellant argues that the "Supreme Being" clause in the statute is unconstitutional. He attacks the clause on two grounds. First, he argues by specious reasoning that the clause offends the VI Article (3rd Clause) of the United States Constitution which provides:

"* * * but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." Art. VI, § 3, U.S.Constitution, U.S.C.A.

Appellant argues, rather circuitously, that conscientious objectors choose prison rather than violate their principles, and thereby, as felons, are ineligible for public office. The reasoning is specious.

Exemptions rest upon the grace of the government, and not upon constitutional rights. Local Draft Board No. 1 of Silver Bow County, Montana v. Connors, 9 Cir., 1941, 124 F.2d 388; Richter v. United States, 9 Cir., 1950, 181 F.2d 591, certiorari denied 340 U.S. 892, 71 S.Ct. 199, 95 L.Ed. 647, and Cannon v. United States, 9 Cir., 1950, 181 F.2d 354, certiorari denied 340 U.S. 892, 71 S.Ct. 199, 95 L.Ed. 647.

Appellant further argues that the Supreme Being clause offends the First Amendment of the Constitution, to-wit:

"Congress shall make no law respecting an establishment of religion * * *."

**24**

This court has previously decided this point adversely to appellant in George v. United States, 9 Cir., 1952, 196 F.2d 445, at page 450, certiorari denied 344 U.S. 843, 73 S.Ct. 58, 97 L.Ed. 656, where it was said:

"In sum, as the exemption from participation in war on the ground of religious training and belief can be granted or withheld by the Congress, the Congress is free to determine the persons to whom it will grant it, and may deny it to persons whose opinions the Congress does not class as 'religious' in the ordinary acceptance of the word. So assuming that the definition of 'religious training and belief' in Section 456(j) is restrictive, such restriction is within the constitutional power of the Congress."

See Berman v. United States, 9 Cir., 1946, 156 F.2d 377, 381–385, certiorari denied 329 U.S. 795, 67 S.Ct. 480, 91 L.Ed. 680, rehearing denied 329 U.S. 833, 67 S.Ct. 621, 91 L.Ed. 706.

Judgment affirmed.